[No. H035320. Sixth Dist. Sept. 30, 2011.]

THE PEOPLE, Plaintiff and Appellant, v.
AUGUSTIN SANTILLAH URIBE, Defendant and Respondent.

838

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan and Amy Haddix, Deputy Attorneys General, for Plaintiff and Appellant.

David D. Martin, under appointment by the Court of Appeal, for Defendant and Respondent.

## OPINION

**DUFFY, J.**—In April 2008, this court reversed the judgment entered against defendant Augustin Santillah Uribe, who had been convicted two years earlier of sex crimes involving his granddaughter, Anna. (*People v. Uribe* (Apr. 24, 2008, H030630) [nonpub. opn.] (*Uribe*).)[1] Our reversal was based on the failure of the Sexual Assault Response Team (SART) to disclose to the defense a videotape of a medical examination of Anna. There was no

---

[1] We filed the unpublished opinion in *Uribe* on April 24, 2008. On May 19, 2008, on our own motion, we ordered the opinion partially published. (See *People v. Uribe* (2008) 162 Cal.App.4th 1457 [76 Cal.Rptr.3d 829].) In this appeal, pursuant to Evidence Code sections 452, subdivision (d) and 459, subdivision (a), we granted a request for judicial notice of the *Uribe* opinion in its entirety. Because we deem it necessary in this appeal to refer to both published and unpublished portions of the prior opinion, we will cite appropriately to the official reporter and the unpublished opinion, respectively.

suggestion from the record in that case that the prosecutor himself knew about the videotape before defendant was convicted. We concluded, however, that the SART unit was part of the prosecution team, and therefore its nondisclosure of the videotape constituted *Brady* error (*Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]) that was prejudicial to the defense.

On remand, defendant filed a motion to recuse the Santa Clara County District Attorney's Office, claiming that the district attorney and members of the SART unit had conspired to violate state law by not documenting that the latter had videotaped its examinations of alleged victims of sexual assault, thereby preventing members of the defense bar from obtaining critical information in sexual assault cases. Defendant also filed a nonstatutory motion to dismiss the information based upon the alternative grounds of double jeopardy and outrageous prosecutorial misconduct in violation of his due process rights. Defendant argued in the motion to dismiss that members of the SART unit and the prosecutor had been aware of the videotape at the time of the first trial and had suppressed it in order to thwart defendant's effort to obtain an acquittal.

After extended evidentiary hearings and briefing on the motions, the court denied the motion to disqualify the district attorney. It denied the motion to dismiss made under double jeopardy principles, but it granted the motion on the ground of prosecutorial misconduct. The court concluded that Troy Benson, the deputy district attorney who had prosecuted the first trial, had testified untruthfully in the hearings on the motions. In a strongly worded opinion, the court found the existence of "egregious prosecutorial misconduct committed *following reversal* for a *Brady* violation [that was] . . . so grossly shocking and outrageous that it offends the universal sense of justice to allow prosecution in this matter to proceed." (Original italics.)

The People contend that the court erred in dismissing the information. We agree. A court may dismiss an information in an extreme case to address outrageous governmental conduct. A prosecutor's false testimony in any court proceeding is a grave affront to the judicial system. It is undoubtedly an act that is "outrageous" in a general, nonconstitutional sense. When such prosecutorial misconduct impairs a defendant's constitutional right to a fair trial, it may constitute outrageous governmental conduct warranting dismissal. But here the false testimony occurred in a peripheral hearing and was not shown to have prejudiced defendant's right to a fair trial. The misconduct thus did not constitute outrageous governmental conduct in violation of due process. Accordingly, while we acknowledge the trial court's understandable and profound concern about the former prosecutor's misconduct, including his false testimony, the court chose the wrong remedy. We will reverse the dismissal order.

## PROCEDURAL BACKGROUND

### I. *Prior Trial*

Defendant was charged by a second amended information filed in February 2006 with five felony sex offenses against Anna, namely, three counts of aggravated sexual assault of a child (violation of Pen. Code, § 269; counts 1 through 3),[2] and two counts of lewd or lascivious acts on a child (violation of § 288, subd. (a); counts 4 and 5). A jury trial commenced in February 2006 before the Honorable Paul Bernal. We summarize relevant evidence from the prior trial in the succeeding two paragraphs.[3]

Anna, defendant's granddaughter, was 12 years old and was attending the seventh grade at the time of the trial. She testified that on one occasion before she started kindergarten, her grandfather went into her room and digitally penetrated her vagina. In another incident when Anna was five, defendant came into the living room where she was sleeping, lay down next to her, removed her clothes, and had forcible sexual intercourse with her. When Anna was nine and on a family trip to Tijuana, defendant lay down next to her in the back of his van, pulled her pants and underwear down, and had forcible intercourse. And when Anna was 11 years old, defendant had her sit on his lap, put his hand under her pants and panties, and digitally penetrated her vagina.[4]

There was a significant amount of medical testimony at the trial. (See *Uribe, supra,* H030630 [nonpub. opn.].) Mary Ritter, a physician's assistant and clinic coordinator at the Center for Child Protection (Center) in the Santa Clara Valley Medical Center (Valley Medical), conducted a SART examination of Anna in July 2005. She used a colposcope, which has a camera attached to it that permits the examiner to take magnified photographs. Several photographs taken by Ritter during her examination of Anna were introduced as exhibits. Ritter opined that there was a V-shaped configuration indicating that there had been a prior hymenal tear consistent with the occurrence of a penetrating event. A defense expert, Dr. Theodore Hariton, a retired obstetrician and gynecologist, opined, based upon records and photographs from the SART exam, that "with reasonable medical certainty this

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] Extensive treatment of the evidence from the original trial is found in our prior opinion. (See *Uribe, supra,* H030630 [nonpub. opn.].)

[4] Anna was impeached by evidence that, before trial, she had told a social worker, an investigator, a nurse, and at least two police officers that she had lied about defendant's sexual misconduct. She had also testified during cross-examination at the preliminary hearing that she had lied about everything she had said during her earlier examination by the prosecutor. Anna was also subjected at trial to extensive cross-examination that exposed a number of contradictions and inconsistencies concerning the details of the alleged incidents. (See *Uribe, supra,* H030630 [nonpub. opn.].)

[penetrating trauma] did not happen." He relied in particular on one photograph, defense exhibit I, as depicting what "can well be a normal hymen." Dr. David Kerns—a pediatrician and the Center's medical director—testified in rebuttal "that there was definite physical evidence of penetrating trauma to [Anna's] hymen." Dr. Kerns singled out one particular photograph in support of his conclusion. He also testified that the photo exhibit on which Dr. Hariton had relied was a bad photo and did not even depict the patient's hymen.

On March 3, 2006, the jury convicted defendant on counts 2 through 5 and acquitted him on count 1.

## II. *Posttrial Proceedings*

Defendant filed a motion for new trial on the basis of newly discovered evidence (i.e., the SART video). The motion was based in part upon the declaration of defense counsel, Alfonso Lopez, who declared that he had (1) made a written pretrial request to Benson for all photos and documentation relating to the SART exam; (2) filed a pretrial motion to release documents subpoenaed from Valley Medical concerning Anna; (3) received, before trial, a medical report, photos and laboratory findings concerning the SART exam (but no videotape); (4) spoken with Ritter on March 26, 2006 (after the verdict), and she had informed him that she was in possession of a videotape of Anna's SART exam; and (5) subpoenaed and obtained the videotape of the SART exam after his conversation with Ritter. Defendant argued that the prosecution should have disclosed the video pursuant to *Brady v. Maryland, supra,* 373 U.S. 83.

The court denied the motion for new trial. It also denied a second new trial motion that had been filed by defendant on the basis that Anna had signed a declaration completely recanting her charges of molestation.

In August 2006, defendant was sentenced to a prison term of 30 years to life.

## III. *Prior Appeal*

On April 24, 2008, we reversed the judgment on the basis that the nondisclosure of the SART video constituted a *Brady* violation that was prejudicial to defendant. We concluded that Valley Medical personnel who had performed the examination of Anna and created the undisclosed SART video were "part of the 'prosecution team' for *Brady* purposes. [Citation.] Their knowledge of the existence of the SART video was thus imputed to the prosecution." (*People v. Uribe, supra,* 162 Cal.App.4th at p. 1481.) We held further that because "[t]he SART video was favorable to the defense"

and "constituted suppressed evidence under *Brady*," and because "our confidence in the outcome of the trial [was] undermined by the suppression of this evidence by the prosecution" (*id.* at p. 1482), the *Brady* violation compelled reversal of the judgment. (*Ibid.*)

### IV. *Proceedings on Remand*

#### A. *Procedural History*

In January 2009 (after the case was remanded), defendant filed a motion to dismiss the information on the basis of double jeopardy and prosecutorial misconduct. He alleged that the district attorney, Ritter, and Kerns were all aware of the existence of the videotape of Anna's SART exam "and chose to withhold that evidence and make misrepresentations during [the] testimony [of Ritter and Kerns] to keep the SART video suppressed." He contended further that "Dr. Kerns, in conspiracy with the prosecutor's office, did not want defense attorney[s] to muddy up the waters with . . . SART video[s because] . . . they were concerned that . . . SART video[s] would give defendants evidence that would exonerate them." Defendant argued that in light of the existence of the SART video, the trial testimony of Dr. Kerns—in which he strongly criticized Dr. Hariton's opinions because he had relied on an allegedly unreliable photograph—was false. In a supplemental filing, defendant urged that the motion to dismiss should be granted based upon "outrageous prosecutorial misconduct at trial in violation of State and Federal Due Process." Defendant argued that the prosecutor's *Brady* error in failing to disclose the SART video that resulted in the reversal of the judgment of conviction here, "[a]lthough . . . a gross disregard for Mr. Uribe's due process rights, . . . [was] even more outrageous [in that the prosecutor and Dr. Kerns and Ritter] conspired to keep all SART videos suppressed between 1991 and 2006." He concluded that this " 'institutional prosecutor[ial] misconduct' " was so severe that dismissal of the information was warranted.

In February 2009, defendant filed a motion to disqualify the district attorney on the basis of conflict of interest, pursuant to section 1424. He alleged that Ritter, Kerns, and the prosecutor's office had "conspired to violate State law by not documenting SART exams on Office of Criminal Justice Planning 925 (Form 925)" for the purpose of concealing the fact that Valley Medical was videotaping SART exams of alleged sexual assault victims. He argued that the district attorney could "not prosecute [the] case fairly and even-handedly . . . [because] the prosecutor's office [was] part of a conspiracy to withhold evidence from defendant."

The People opposed the recusal motion and the motion to dismiss the information based on double jeopardy and outrageous prosecutorial misconduct.

The court conducted an evidentiary hearing over the course of 13 days spanning from March 2009 to January 2010. Substantial evidence was presented by the parties in six court sessions, which is described below.[5] After submission of the bulk of the evidence, on October 7, 2009, the court denied the motion to disqualify the district attorney. In so ruling, the court found "that there was no evidence presented to suggest that either Doctor Kerns or Miss Ritter conspired with any current or former member of the Santa Clara County District Attorney's Office to conceal or withhold the subject [SART exam] videotapes from disclosure." It found further "that there was no evidence presented to suggest that either the current or the former [d]istrict [a]ttorney, [or] any member of either['s] executive management staffs, had actual knowledge of the existence of any sexual assault examination videos prior to 2006." The court accordingly concluded that defendant had failed to show "the existence of either a conspiracy or a conflict of interest that would render it unlikely that defendant would receive a fair retrial."

After further briefing, argument, and submission of additional evidence, the court on January 6, 2010, denied the motion to dismiss based upon double jeopardy, and granted the motion to dismiss based upon prosecutorial misconduct in violation of due process. The court concluded in its formal order: "This Court is presently confronted with the rare and concerning case of egregious prosecutorial misconduct committed *following* reversal for a *Brady* violation. Mr. Benson's numerous acts of misconduct, culminating in his false testimony in this proceeding, strikes at the foundation of our legal system and is so grossly shocking and outrageous that it offends the universal sense of justice to allow prosecution in this matter to proceed. As such, defendant's motion to dismiss on due process grounds is granted." (Original italics.)[6]

The People filed a timely notice of appeal from the dismissal order. The appeal from the order is proper. (§ 1238, subd. (a)(8) [order or judgment dismissing or otherwise terminating all or portion of action appealable by People]; see also § 1238, subd. (a)(1) [People may appeal order setting aside all or part of indictment, information, or complaint]; *Bellizzi v. Superior Court*

---

[5] The parties stipulated that the evidence, ostensibly presented for the recusal motion, would be considered in connection with both motions.

[6] The court foreshadowed these findings at a hearing approximately two months before it announced its ruling in open court by posing the following question to the People: "[S]o let's say that there is a finding of credibility or lack thereof, let's say a prosecutor—that there is a finding that a prosecutor falsely testified under oath. [¶] . . . [¶] Would that rise to the level of truly outrageous conduct that would warrant dismissal?" Later in the same proceeding, the court observed: "I know that some cases that we found said that suborning perjury did not rise to the level necessary to dismiss a case. So we are dealing with intentional falsehood, perjury. But I'm also mindful of the fact that if, in fact, there was testimony that was not truthful, it wasn't given to secure a conviction. This is an ancillary proceeding . . . ."

(1974) 12 Cal.3d 33, 37, fn. 3 [115 Cal.Rptr. 52, 524 P.2d 148] [People's appeal from dismissal of information due to noncompliance with discovery order proper].)

## B. *Evidence Presented at Hearing*

### 1. *Overview*

Much of the testimony concerned the Center's practice of videotaping SART examinations; its use, documentation and retention of the videotapes; and any communications it had with the district attorney relating to the Center's videotaping practices. This evidentiary focus was in keeping with the defense theory for the motions that there was a conspiracy between the Center (Dr. Kerns and Ritter) and the district attorney to conceal the practice of videotaping SART examinations. The inquiry—analogous to the United States Senate Judiciary Committee's inquiry into the involvement of President Nixon in the Watergate scandal of the early 1970's[7]—was: What did the district attorney know about the Center's videotaping of SART examinations and when did the district attorney know about the practice? The bulk of the evidence presented therefore through the testimony of 19 witnesses[8] was related to the alleged awareness of district attorney personnel before March 2006 of the Center's practice of videotaping SART examinations.

As noted, the court did not find the existence of a conspiracy between the Center and the district attorney to conceal the practice of videotaping SART examinations, and it did not find that "either the current or the former [d]istrict [a]ttorney, [or] any member of either['s] executive management staffs" knew about the Center's practice of videotaping SART examinations prior to 2006. The court's finding of prosecutorial misconduct was directed toward Benson alone, and the court made clear that this misconduct focused upon his having given false testimony during the hearing on the motions. Although the court did not specify the "numerous acts of misconduct" in its order or elaborate on its finding of the prosecutor's untruthfulness, there were several areas in which Benson's testimony was contradicted by others. These areas concerned (1) how Benson learned of the existence of a SART exam video in *People v. Zeledon (Zeledon)* (a case that he handled before the *Uribe*

---

[7] A memorable and repeated inquiry of Senator Howard Baker during the Watergate hearings was, "What did the President know [about the coverup of the June 1972 burglary at the Democratic National Committee's office at the Watergate Complex in Washington D.C.] and when did he know it?" (New World Encyclopedia, Watergate scandal, Investigation, Tapes <http://www.newworldencyclopedia.org/entry/Watergate_scandal> [as of Sept. 30, 2011].)

[8] There were 15 witnesses who gave live testimony before the court, nine of whom were affiliated with the district attorney. In addition, counsel stipulated to the substance of brief testimony of two individuals without their personal appearance, one witness was permitted to testify through submission of a declaration, and one witness, a retired judge, offered evidence through the submission of the report of his investigative findings.

trial); (2) how and when he learned about the SART video in *Uribe*, and whether he informed his adversary, Lopez, about the video's existence; (3) when he spoke with his supervisor and the head of the sexual assault unit, Victoria Brown, about having learned about the SART video in *Uribe*; and (4) whether he told Lopez after the *Uribe* appeal that he (Benson) was the one who allegedly first learned about the existence of the SART video.

As an aid to our discussion below of the testimony presented at the hearing, we present the following chronology:

| | |
|---|---|
| July 29, 2005: | Mary Ritter conducts SART exam of Anna. |
| January 12, 2006: | Ritter provides Benson with video of SART exam of alleged victim in *Zeledon*. |
| February 1, 2006: | Trial begins in *Uribe*. |
| March 3, 2006: | Jury convicts defendant of four felonies. |
| March 22, 2006: | Lopez learns from consultant that Anna's SART exam may have been videotaped. |
| March 28, 2006: | (Lopez testimony): Lopez speaks to Ritter and learns for first time that Anna's SART exam was videotaped. |
| | (Benson testimony): Benson speaks to Ritter about another case and she informs him that she videotaped Anna's SART exam. Benson immediately speaks to Brown about the video, and calls Lopez afterwards to tell him about existence of video. |
| March 29, 2006: | Lopez signs declaration in support of issuance of subpoena for video, referring to March 28 conversation with Ritter. |
| March 30, 2006: | Defense motion for issuance of subpoena for video is filed and served on district attorney. |
| April 4, 2006: | Brown sends e-mail to members in her sexual assault unit about disclosing SART videotapes to defense counsel. |

(Brown testimony): Memo sent the day of, or the day after, she spoke with Benson.

(Benson testimony): Memo sent at least one week after he spoke to Brown.

April 7, 2006: Original date for sentencing in *Uribe*.

(Lopez testimony): Lopez informs court and Benson of discovery of SART video; Benson expresses surprise that Ritter had videotaped SART exams.

July 28, 2006: Court denies motion for new trial in *Uribe*.

February 7, 2008: (Benson testimony): Benson confirms with Lopez that Benson had first informed Lopez in March 2006 about existence of SART video.

(Lopez testimony): Benson, upset, approaches Lopez and asks him if he could provide Benson with a declaration. (No statement by Benson that he had first discovered the SART video.)

April 24, 2008: Court of Appeal reverses judgment of conviction in *Uribe*.

May 20, 2008: (Benson testimony): Lopez confirms in telephone conversation that Benson had informed Lopez about existence of SART video. (Conversation denied by Lopez.)

June 5, 2008: Lopez sends e-mail to Benson, indicating that Lopez was the person who first discovered that Ritter had videotaped the SART exam and had then informed Benson of the discovery.

### 2. *Videotaping of SART examinations*

The Center at Valley Medical began videotaping SART examinations in or about August 1991 and has done so continuously since that time. There are archived videotapes of approximately 3,300 SART exams. According to both Dr. Kerns and Ritter, the videotapes were not used as a part of the examination of the individual patients. Dr. Kerns testified that videotaping was done for "the primary reason [of providing] . . . live training during the exam." The videos also served as a backup in the event the still photographs

taken during a given examination were lost or damaged. In Dr. Kerns's view, when there were still photographs available, "the video images were essentially worthless for the diagnostic process." Ritter also testified that she had never used a video to assist her in reaching an opinion in a SART exam.

Dr. Kerns believed that, prior to the *Uribe* trial, there were one or two instances in which attorneys requested the videotape of a SART exam. Dr. Kerns and Ritter both testified that they made no attempts to conceal from anyone, including the defense bar, the fact that the Center was videotaping SART exams.

Ritter testified that there had been several occasions over the years in which attorneys from the Santa Clara County District Attorney's Office had toured the Center's facility. A VCR was plainly visible in the examination room from 1991 to 2006. It was not Ritter's practice during tours to note the fact that exams were videotaped, and she did not recall having talked about videotaping during any of the tours. She did not recall that Benson ever took a tour of the facility, although they met once at her office to discuss a case. Nor did she recall having spoken with him about videotaping SART exams. Likewise, Ritter did not recall having discussed with Brown the fact that the Center was videotaping SART exams.

In February 2005, Deputy District Attorney Paul Colin, who had been assigned for that year to the sexual assault unit, took a tour of the Center. At some point, either Ritter or another Center employee pointed out the photographic equipment in the examination room and mentioned something about videotapes. He had the impression that videotaping may have occasionally occurred but that the videotapes were not saved. After the tour, Colin asked his supervisor, Brown, if she was "aware of any issue with videotaping." Brown testified that she had no recollection of this conversation, and that she first became aware that Colin had previously known anything about videotaping when she saw his December 2008 memorandum on the subject.

It was stipulated by the parties that Dolores Carr would testify that she was elected district attorney in November 2006; took office in January 2007; was previously a deputy district attorney and was the supervisor of the sexual assault unit between 1998 and 2000; and first became aware that Valley Medical videotaped SART exams after having taken office in 2007. It was further stipulated that George Kennedy would testify that he was the elected district attorney from 1990 to 2006; was not aware that Valley Medical videotaped SART exams until after defendant was convicted in 2006; and was unaware of any attempts by any employee of his office to conceal Valley Medical's videotaping of SART exams.

### 3. *Knowledge of public defender of SART exam videotaping*

The Santa Clara County Public Defender's Office retained the Honorable William F. Martin, Judge of the Santa Clara County Superior Court (retired), to investigate the extent to which the public defender's and alternate public defender's offices were aware before 2006 of the Center's practice of videotaping SART exams. Judge Martin noted in his report that Javier Rios, a deputy public defender, had sent an e-mail to attorneys in both offices on March 13, 2001, in which he indicated that he had learned from another attorney that Ritter videotaped her SART exams. Judge Martin concluded that, notwithstanding this e-mail—which Rios himself did not recall—"there was no generalized knowledge [on the part of the members of either office] of the [Valley Medical] practice of videotaping SART exams until after the Uribe trial in early 2006."

### 4. *SART exam video in* People v. Zeledon

Benson was assigned to the sexual assault unit of the district attorney's office in or about August 2005; his previous assignment had been to the gang unit. After the transfer, he was assigned the *Zeledon* case. After receiving a copy of a letter from a defense expert, Dr. James Crawford, criticizing the quality of still photographs from the alleged victim's SART exam, Benson met with Ritter at her office in January 2006. He testified that she told him at that time that her general practice was to videotape SART examinations and retain the videotapes until the still photographs were developed. On January 12, 2006, she provided Benson with a copy of a video of the SART exam of the alleged victim in *Zeledon*. Benson's paralegal sent the video to Dr. Crawford a week later. Benson testified that sometime between January 19 and February 3, 2006, he ran into Richard Pointer, the attorney for the defendant in *Zeledon*, who asked Benson how long the Center had been videotaping SART exams; Benson replied that he did not know. Pointer testified that he did not recall such a conversation.

Pointer testified that he met with Ritter at the Center sometime before January 19, 2006 (i.e., the date the SART videotape was sent to Dr. Crawford). In the course of his asking about the equipment in the examination room, Ritter told Pointer that she videotaped each of the SART exams in addition to taking still photos. This was the first Pointer had heard about the videotaping of SART exams. Pointer asked her for a copy of the videotape for the *Zeledon* case, and Ritter responded that she was willing to produce it, but that Pointer should make a discovery request to the district attorney's office. Thereafter, when Pointer spoke to Benson, he seemed surprised by Pointer's comment that Ritter had said that she videotaped the SART exams.

(Benson testified that Pointer was not the person who had first learned about the videotape. Nor was Pointer the one who had communicated this knowledge to Benson.) After the video was sent to Dr. Crawford and on February 3, 2006, Pointer wrote to Ritter, asking, among other things, when the practice of videotaping SART exams began.

### 5. *Discovery of SART video after* Uribe *trial*

Benson testified that on or about March 28, 2006 (25 days after the jury verdict in *Uribe*), he spoke with Ritter about another case. The conversation took place before the originally scheduled sentencing date in *Uribe* of April 7, 2006. Ritter asked why he had called Dr. Kerns as a rebuttal witness in the *Uribe* trial. Benson responded that the defense expert, Dr. Hariton, had testified that Ritter had somehow manipulated the patient during the exam to make it appear that her hymen had a V-shaped notch consistent with a prior trauma. Ritter responded, " 'That's ridiculous. I've got a video that would show that that didn't happen.' " When Ritter said this, Benson did not react, but "was freaking out in [his] head, because [he] didn't think that these videos were kept." He was not concerned at the time that he had committed a *Brady* violation; rather, he was concerned that the video would end up bolstering the defense. Benson testified that this was when he had first learned there was a video of Anna's SART exam. He admitted that he did not think to ask Ritter several weeks earlier—when he was preparing for trial in *Uribe* and after producing the SART video in *Zeledon*—if such a video existed.

Ritter testified that she did not recall having had a conversation with Benson about the SART video in this case.

Benson testified that immediately after his conversation with Ritter, he went to see his supervisor, Brown. He asked her if prosecutors were " 'supposed to be turning over these videos of the SART exams,' " and Brown responded, " 'What videos?' " After Benson explained that Ritter had told him that the Center had videotaped SART exams, Brown instructed Benson to call Lopez and the court to advise them of this discovery. Benson did not tell Brown that a video of the alleged victim's SART exam in *Zeledon* had been produced to the defense expert in that case about a month before the *Uribe* trial.

Brown testified that her conversation with Benson occurred on April 3 or April 4, 2006, about a week later than when Benson testified that the conversation occurred. Brown was "stunned"; this was the first time she had heard that Ritter had videotaped SART exams. She did not recall whether Benson said that he was about to, or had already informed defense counsel

about the existence of the SART video. Benson did not tell her that he had been involved in a prior case in which a SART video was provided to the defense.

Benson testified that, after speaking with Brown, he called Lopez, who "thanked [Benson] for disclosing this information to [him]." According to Benson, that day or the next day (i.e., Mar. 28 or 29), after he had spoken with Judge Bernal's clerk, he and Lopez met with Judge Bernal, and it was agreed that because Lopez anticipated making a motion for new trial, he would subpoena the SART video.

Lopez's testimony directly contradicted Benson regarding the circumstances of the discovery of the videotaping of Anna's SART exam, their contacts with each other, and their communications with the trial judge on that discovery. Lopez testified that he, not Benson, discovered the videotape after speaking with Ritter. After the *Uribe* jury verdict, a colleague suggested Lopez contact another medical expert in the field of sexual assaults, Dr. Crawford. Lopez first spoke with Dr. Crawford on March 21 or 22, 2006. During their conversation, Dr. Crawford asked Lopez if his expert, Dr. Hariton, had viewed the videotape of the SART exam.[9] Lopez was surprised by the comment because he had not previously heard that the exam had been videotaped. Lopez was "shocked" because he had submitted a pretrial informal discovery request to Benson and had caused a subpoena duces tecum to be served on Valley Medical; he therefore thought he had received all material concerning the SART exam.

According to his testimony, Lopez then contacted Ritter. After leaving several messages or trading phone calls, they spoke on March 28, 2006, and she confirmed that there was a video of the SART exam. He told her not to destroy the video and that he was going to subpoena it. Ritter confirmed in her testimony that she spoke with Lopez on the telephone sometime after the *Uribe* trial concerning the fact that she had videotaped SART exams. Lopez testified that he had no conversations with Benson about *Uribe* between the time he spoke with Dr. Crawford and when he spoke with Ritter about the existence of the video.

Lopez testified that on the same day after speaking with Ritter, he prepared a motion and subpoena to require Ritter to produce the SART video. He signed a declaration in support of the subpoena on March 29, 2006, in which he stated that he was "informed and believe[d] based on [his] personal discussion with [Mary] Ritter on March 28, 2006, that Mrs. Ritter has

---

[9] Dr. Crawford confirmed in his testimony that he spoke with Lopez on March 22, 2006, when he was retained as a consultant in *Uribe*, and that he would have asked Lopez for photos of the SART exam and would have told him that a video of the exam might exist.

possession of a video tape of the SART exam on the victim in this case." The subpoena was served on Ritter on March 30, 2006, and the motion was filed that day and served on the district attorney's office by leaving a copy with the clerk's office.

Lopez believed that he called Benson sometime after the motion was filed and before April 7, 2006, but does not recall speaking with him. Lopez testified that the first time they spoke was immediately before meeting with Judge Bernal in chambers on April 7, 2006. During in-chambers discussions, Lopez advised that he had discovered the existence of the SART video from talking with Ritter. Benson said "he was shocked and surprised that Mary Ritter was videotaping." Benson did not say when he had discovered the existence of a videotape.

Brown testified that she telephoned Ritter "almost immediately" after the conversation with Benson about the SART video in *Uribe* which she recalled having taken place on April 3 or April 4. Although Brown did not recall if she spoke to Ritter in that initial contact or left a message, she testified that they spoke within 24 hours of Brown's conversation with Benson. Ritter told her that videotaping of the SART exams was done as a backup to the still photographs, but that the videos were " 'not forensically acceptable.' " Brown sent an e-mail on April 4, 2006, to members of her sexual assault unit. (Contrary to Brown's testimony, Benson recalled that the e-mail had been sent at least a week after his conversation with Brown.) She composed it either while speaking with Ritter or immediately after hanging up the phone. She wrote: "Ritter videotapes child SART exams as back up to her photos . . . . The opinions [the Center] forms are based on the photos and not the video[s] due to the poor quality of the videos. However, if defense wants the documentation re the SART exam, the video is part of that documentation." Brown testified that "the whole purpose of [the e-mail was] not only to inform the team of the [SART videotapes'] existence, but to tell them they needed to make this part of the discovery process when we were the ones providing the documentation of the SART exam."

6. *Communications regarding SART video after* Uribe *appeal*

Benson testified that he twice confirmed with Lopez in 2008 that it was Benson who had first informed Lopez in March 2006 about the existence of the SART video. The first such confirmation was on February 7, 2008, and Benson made a note of this conversation. Lopez's testimony was contrary to Benson's. Lopez testified that in or about February 2008, he ran into Benson in the hallway of the courthouse. Benson approached Lopez, appeared very upset, and asked Lopez, " 'Do you think you could write me a declaration?' "

That was the end of the conversation. Although Benson did not mention *Uribe*, Lopez knew that Benson was referring to that case, because Benson had a newspaper article about the case in his hand when he approached him to ask his question.

Benson testified that on May 20, 2008, Lopez again confirmed by telephone that Benson had been the one to inform Lopez about the existence of the SART video; Lopez said that he would provide Benson with a declaration to that effect to submit to the State Bar. (As Benson explained in a May 2008 e-mail to Judge Bernal, copied to Lopez, due to the reversal of the *Uribe* judgment, he found himself "in the unique situation of having to self-report unethical conduct to the State Bar for discovering and disclosing evidence.") After several e-mails from Benson seeking a declaration from Lopez, Lopez advised Benson on June 5, 2008, that a statement of facts that Benson had prepared was incorrect: it was Lopez's recollection that he, not Benson, had first learned about the SART video in a conversation with Ritter after the jury trial and that Lopez then informed Benson of its existence. Lopez testified that he only became aware of Benson's contention that he, not Lopez, had first learned about the SART video when he received Benson's June 4, 2008 e-mail with a draft declaration for Lopez's signature. Lopez sent the e-mail in response on June 5, 2008, because he was not going to sign a declaration that was false. In that e-mail, Lopez indicated that Benson's proposed statement of facts was "not correct in this area: . . . after the [jury trial, Lopez] first learned of the video tape from speaking with Mary Ritter and [Lopez] notified [Benson] of that. . . ." Lopez sent a second e-mail to Benson to the same effect on June 23, 2008, and also indicated that he would be willing to sign a declaration indicating that he had no reason to suspect that Benson was aware of the existence of the SART video before or during the *Uribe* trial because Lopez then believed that Benson had first become aware of the video from talking with Lopez after the trial.

Benson also testified that he spoke with Judge Bernal by telephone in February 2008[10] "to make sure that [Benson's] recollections [were] correct" as to which attorney had first learned about the existence of the SART video in *Uribe*. No one else participated in this ex parte communication. Benson wrote a memorandum indicating Judge Bernal's recollection that Benson had been the one to learn of the existence of the SART video. This February 2008 telephone call between Benson and Judge Bernal was not corroborated by Judge Bernal's testimony. Nor did Judge Bernal testify that he had known who had first learned about the SART video. Rather, Judge Bernal declared that he had no contact with either counsel concerning *Uribe* after the second

---

[10] The record presents some confusion as to the timing of Benson's telephone call to Judge Bernal. After Benson testified that the call took place in February 2008, he stated that it occurred after the judgment in *Uribe* was reversed (i.e., Apr. 24, 2008).

motion for new trial was denied, except for being involved in a series of e-mail exchanges "relating to an attempt to fashion a settled statement of facts."[11] On May 20, 2008, Benson sent an e-mail to Judge Bernal in which he, among other things, requested that Judge Bernal supply him with a declaration "stating how the Court became aware of the [SART video] so that [Benson could] include it with [his] letter and declaration to the State Bar." Judge Bernal responded that the canons of the California Code of Judicial Ethics precluded him from contacting the State Bar without either a request from that body or a subpoena. In June 2008—after receiving a copy of Lopez's e-mail indicating that it was Lopez, not Benson, who had first become aware of the SART video—Judge Bernal sent an e-mail indicating he "was not at that end of what happened" and had only hearsay information from his clerk concerning the discovery of the SART video.

### 7. *Prosecution of* Uribe *after remand*

After remand and in June 2008, Deputy District Attorney Tim McInerny was assigned as trial attorney for the retrial of the *Uribe* case. Although McInerny was assigned to succeed Benson as trial attorney, the latter was responsible for filing motions in the case after remand, including a motion for discovery from defendant and a motion for the conditional examination of Anna's mother.

## DISCUSSION

### I. *Standard of Review*

The standard for reviewing orders granting nonstatutory motions to dismiss is somewhat uncertain due to a dearth of California authority involving review of such orders. Defendant contends that our review of the court's factual findings is governed by the substantial evidence standard, and that the dismissal order is reviewed for abuse of discretion. The People disagree, arguing that the question presented here is a mixed question of fact and law and the order is, in part, subject to independent review.

Mixed questions of fact and law "are those 'in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant legal] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.' [Citation.]" (*People v. Louis* (1986) 42 Cal.3d 969, 984 [232 Cal.Rptr. 110, 728 P.2d 180] (*Louis*), quoting *Pullman-Standard v. Swint*

---

[11] Without objection from defendant, a declaration signed by Judge Bernal was introduced by the People as an exhibit.

(1982) 456 U.S. 273, 289, fn. 19 [72 L.Ed.2d 66, 102 S.Ct. 1781].) The review of mixed questions thus involves a two-step process of first determining the facts relevant to the issue being decided and then applying the law to those established facts. (*Louis*, at pp. 984–985.) Deference is given to the trial court in considering the relevant factual findings: " '[T]he power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.' " (*People v. Leyba* (1981) 29 Cal.3d 591, 596–597 [174 Cal.Rptr. 867, 629 P.2d 961] (*Leyba*), quoting *People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]; see also *People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87] [trial court's "credibility determinations and findings on questions of historical fact" concerning juror misconduct upheld if based on substantial evidence].) In the second step—application of the law to the historical facts—the trial court's decision is generally reviewed independently. (*People v. Cromer* (2001) 24 Cal.4th 889, 900–901 [103 Cal.Rptr.2d 23, 15 P.3d 243] (*Cromer*).)

Thus, for instance, in *Cromer, supra*, 24 Cal.4th at page 893, after his conviction of three counts of armed robbery based upon the victim's preliminary hearing testimony, the defendant successfully challenged the trial court's determination that the prosecution had used reasonable diligence in attempting to secure the victim's appearance at trial. The high court held that while the determination of the historical facts concerning the prosecution's efforts to locate the witness were subject to a deferential review standard, "the second inquiry—whether these historical facts amount to due diligence by the prosecution—requires application of an objective, constitutionally based legal test to the historical facts. [Citation.] . . . '[T]he trial court's superior capacity to resolve credibility issues is not dispositive . . . . [T]he crucial question entails an evaluation made *after* determination of [the historical] circumstances . . . .' [Citation.]" (*Id.* at p. 900.) The court therefore concluded that appellate courts should independently review the determination of whether the prosecution's efforts to secure the unavailable witness's testimony were reasonable in the constitutional sense of justifying an exception to the constitutional right of confrontation guaranteed to the defendant. (*Id.* at p. 901; see also *People v. Seijas* (2005) 36 Cal.4th 291, 303–304 [30 Cal.Rptr.3d 493, 114 P.3d 742] [witness's assertion of privilege against self-incrimination is mixed question subject to independent review, because issue implicates defendant's constitutional confrontation right].)

The Supreme Court has explained that "California and federal cases have deemed the independent review standard appropriate for a diverse array of mixed law and fact questions, often on the ground, among others, that such

questions were constitutionally significant and/or 'predominantly legal.' [Citations.]" (*People v. Ault* (2004) 33 Cal.4th 1250, 1264–1265, fn. 8 [17 Cal.Rptr.3d 302, 95 P.3d 523] (*Ault*).) For example, the reasonableness of an investigatory stop is a mixed question in which the trial court's determination of the relevant facts is subject to deferential review, but the application of the constitutional standard of reasonableness to those facts is reviewed independently. (*Leyba, supra*, 29 Cal.3d at pp. 596–597; see also *People v. Alvarez* (1996) 14 Cal.4th 155, 182–184 [58 Cal.Rptr.2d 385, 926 P.2d 365] [reasonableness of search following vehicle stop at highway checkpoint for routine inspection of license and registration is mixed question; application of law to established facts reviewed independently].) Similarly, where a statement made to police is challenged by a motion to suppress as violating the defendant's *Miranda*[12] rights, the court's relevant factual findings concerning the circumstances surrounding the statement are reviewed for substantial evidence, but the court's "measurement of the facts against the law" is subject to independent review. (*People v. Waidla* (2000) 22 Cal.4th 690, 730 [94 Cal.Rptr.2d 396, 996 P.2d 46]; see also *People v. Kennedy* (2005) 36 Cal.4th 595, 608–609 [31 Cal.Rptr.3d 160, 115 P.3d 472], disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459 [111 Cal.Rptr.3d 589, 233 P.3d 1000] [ruling that identification procedure was not unduly suggestive is subject to independent review, because it implicates constitutional rights and is a mixed question of fact and law].)

We recognize that it is not universally true that the second step is subject to independent review in a mixed question case. (See *Ault, supra*, 33 Cal.4th at p. 1255 [mixed question of whether juror misconduct was so prejudicial as to warrant new trial order reviewed for abuse of discretion; question of prejudice not subject to independent review].) But whether an independent or more deferential review standard is applied "is influenced in part by the *importance of the legal rights or interests at stake*. [Citation.]" (*Id.* at p. 1265, original italics; see *Cromer, supra*, 24 Cal.4th at p. 901 [holding that independent review standard applied to trial court's conclusion that prosecution used due diligence to locate missing witness "comports with this court's usual practice for review of mixed question determinations affecting constitutional rights"].) Further, "independent appellate review of a mixed law and fact question is crucial when an excessively deferential appellate affirmance risks error in the *final determination* of a party's rights, either as to the entire case, or on a significant issue in the litigation." (*Ault*, at p. 1266, original italics.)

█ The determination of whether the government engaged in outrageous conduct in violation of defendant's due process rights is a mixed question. The first step involves the consideration and weighing of the evidence and assessing the credibility of the witnesses to determine factually whether, and

---

[12] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

to what extent, governmental misconduct occurred. This factual determination is clearly one that is subject to a deferential standard of review. But the second step—whether the governmental conduct constitutes outrageous conduct in the constitutional sense of violating defendant's due process rights—involves the application of law to the established facts and is primarily a legal question. The rights of the respective parties here are extremely important ones, namely, defendant's right to a fair trial and the People's right to prosecute persons believed to be responsible for the commission of serious crimes. And the order of dismissal with prejudice we review is one that results in the final determination of the parties' rights. We hold therefore that the trial court's finding that the governmental conduct was outrageous in violation of defendant's due process rights thereby warranting dismissal is subject to independent review. (See *People v. Tatum* (2008) 161 Cal.App.4th 41, 60, fn. 6 [73 Cal.Rptr.3d 718], disapproved on another ground in *People v. Lara* (2010) 48 Cal.4th 216, 236, fn. 26 [106 Cal.Rptr.3d 208, 226 P.3d 322] [dismissal of untimely petition for involuntary commitment as a mentally disordered offender subject to independent review, because untimely petition and any prejudice therefrom implicates defendant's due process rights].)

Although we conclude otherwise, we recognize that there is some support for defendant's advocacy of an abuse of discretion standard here. (See *People v. Conrad* (2006) 145 Cal.App.4th 1175, 1186 [52 Cal.Rptr.3d 233] [order dismissing action for delay in prosecution resulting in loss of evidence reviewed for abuse of discretion]; *Boulas v. Superior Court* (1986) 188 Cal.App.3d 422, 435 [233 Cal.Rptr. 487] (*Boulas*) [" 'sanction of dismissal is clearly discretionary . . .' "]; cf. *People v. Carmony* (2004) 33 Cal.4th 367, 375 [14 Cal.Rptr.3d 880, 92 P.3d 369] [ruling on request for dismissal in the interests of justice under § 1385 is reviewed for abuse of discretion].) "The abuse of discretion standard is 'deferential,' but it 'is not empty.' [Citation.] '[I]t asks in substance whether the ruling in question "falls outside the bounds of reason" under the applicable law and the relevant facts [citations].' [Citation.]" (*People v. Giordano* (2007) 42 Cal.4th 644, 663 [68 Cal.Rptr.3d 51, 170 P.3d 623].) " 'Discretion is compatible only with decisions "controlled by sound principles of law . . . ." [Citation.]' [Citation.] '[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' [Citation.]" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 [60 Cal.Rptr.2d 93, 928 P.2d 1171].) Thus, the trial court abuses its discretion when it bases its decision "on impermissible factors [citation] or on an incorrect legal standard [citations]." (*People v. Knoller* (2007) 41 Cal.4th 139, 156 [59 Cal.Rptr.3d 157, 158 P.3d 731] [exercise of discretion in granting new trial].)

Here, as discussed below, based upon our independent review, the sanction of dismissal for the outrageous governmental conduct—found to have occurred by the trial court—was unwarranted under established law. But even were we to apply the more deferential abuse of discretion standard, our conclusion would be the same. In apparently neglecting to consider whether, and to what extent, the prosecutorial misconduct prejudiced defendant's substantial rights, the court based its dismissal order on an incorrect legal standard and hence abused its discretion.

## II. *Finding of Prosecutorial Misconduct*

As noted above, in this mixed question case, the trial court's finding of prosecutorial misconduct was based upon its consideration of the evidence and is subject to deferential review. (*Leyba, supra,* 29 Cal.3d at p. 596.) The trial court determined that Benson had attempted to obtain false declarations from Judge Bernal and Lopez, had misled Judge Bernal, and had testified falsely at the hearing on the motions. These factual findings were based upon the evidence presented at the extensive hearings and were in large part made from the court's assessment of the relative credibility of Lopez and Benson.

The court's finding that Benson engaged in substantial misconduct, including untruthful testimony at the hearing on the motions, is supported by substantial evidence. Although not spelled out in the court's order, the court could have found Benson's testimony to have been untruthful in at least three areas. First, the issue of when and how he learned of the video of the alleged victim's SART exam in *Zeledon* was contradicted by Defense Attorney Pointer's testimony. Second, Benson's testimony concerning when and how he learned about Anna's SART exam video was extensively contradicted by Lopez. Lopez testified that he first discovered from Ritter that she had videotaped Anna's SART exam, and he denied that he had learned about the video from Benson. The declaration Lopez signed March 29, 2006, in support of the motion to compel production of the SART video was consistent with his testimony. Ritter did not recall talking to Benson about Anna's SART video. And Benson's testimony was at odds with that of his supervisor, Brown, to the extent she placed her conversation with Benson at least six days *after* the date Benson said it occurred, and thus, significantly, at least four days *after* Lopez's motion—wherein he declared that he had learned about the video from Ritter on March 28—was served on the district attorney.[13] Third, Benson's testimony about conversations he had had with Lopez in February and May 2008 and with Judge Bernal in February 2008 was contradicted by Lopez and Judge Bernal, respectively.

[13] The court specifically identified this conflict in the testimony during argument on the motion to dismiss. The court—in the context of referring to the possibility of untruthful testimony by the prosecutor and mentioning the date discrepancy between Benson's and Brown's testimony—indicated that "the timeline . . . doesn't fit with the testimony."

There was substantial evidence to support the trial court's finding of "egregious prosecutorial misconduct committed *following reversal* for a *Brady* violation." (Original italics.)[14] It remains for us to review independently whether, applying the law to these established facts, the misconduct constituted outrageous governmental conduct in violation of defendant's due process rights which justified dismissal of the information.

### III. *Propriety of Order of Dismissal for Outrageous Conduct*

#### A. *Introduction*

At the heart of the People's position is that dismissal was an unwarranted sanction for Benson's misconduct because "the evidence presented at the hearing show[ed] neither actual prejudice to defendant's fair trial right, nor a substantial likelihood of an unfair trial . . . ." The People argue that the central inquiry of a due process claim based upon prosecutorial misconduct is the fairness of the trial, not the blameworthiness of the misconduct. Accordingly, they assert that since there was neither a showing nor a court finding that Benson's misconduct had an impact on defendant's ability to receive a fair trial, dismissal was improper.

Defendant responds that "[t]he determinative issue" here "is whether the governmental acts are sufficiently outrageous to satisfy the 'shock the conscience' standard . . . [and] determination of prejudice to the defendant's right to a fair trial is not a factor in the court's decision." He argues that under *Rochin v. California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205] (*Rochin*), the order of dismissal was proper because the prosecutorial misconduct shocked the conscience and thereby constituted a violation of substantive due process. Defendant argues further that the authorities relied on by the People are inapposite because they were not cases involving *Rochin* substantive due process claims.

There is apparently no authority addressing the issue before us: Whether the trial court, in addressing prosecutorial misconduct primarily consisting of the giving of false testimony at a pretrial hearing, may impose the sanction of

---

[14] From the record, it appears that the court could have found (but did not so find) that Benson had actual knowledge of Anna's SART exam video before the jury reached its verdict on March 3, 2006. By Benson's own testimony, he knew there was a video of the alleged victim's SART exam in *Zeledon* by no later than January 12, 2006, over a month before the first witness was sworn in the *Uribe* trial. Benson testified that he had thought (before the discovery of the video of Anna's SART exam) that the Center did not retain the videotapes. (This testimony, however, does not explain why the video of the alleged victim's SART exam in *Zeledon* was retained by the Center.) Benson's testimony notwithstanding, the court could have inferred (but apparently did not do so) that Benson knew that there was a video of Anna's SART exam before the trial in *Uribe* commenced.

dismissal with prejudice, where the misconduct did not have a material adverse impact on defendant's ability to receive a fair trial. Neither party has cited any case, either from California or from another jurisdiction, in which the court considered the propriety of imposing the ultimate sanction of dismissal to address prosecutorial misconduct of this nature. Indeed, the court itself acknowledged the absence of apposite authority.

We address below defendant's claim that the dismissal order was justified based upon a substantive due process claim, and we reject that position. We conclude further that the three California cases upon which defendant relies in which there was a dismissal order based upon a finding of outrageous governmental conduct are distinguishable and do not support the court's order. From a review of the relevant cases, we find that a showing of prejudice to defendant's right to a fair trial was required and that the absence of such a showing precluded dismissal as a sanction for prosecutorial misconduct. We also conclude that the federal cases from the Ninth Circuit Court of Appeals addressing outrageous governmental conduct in violation of due process—relied on by the trial court—do not support the dismissal order. Lastly, we hold that the dismissal of the information here was not appropriate as an exercise of the court's inherent supervisory powers. Neither the Ninth Circuit cases cited by the trial court nor the California decision cited by defendant supports the court's dismissal of the information under its authority to supervise judicial proceedings.

B. *Substantive Due Process Claim Under* Rochin v. California

1. *Rochin v. California*

In *Rochin, supra*, 342 U.S. at page 166, government agents, investigating suspected narcotics sales, entered the defendant's home without a warrant, forced open the door to a room on the second floor, witnessed the defendant swallowing capsules next to his bed, and arrested him. The agents took the defendant to the hospital and directed doctors to pump his stomach, resulting in the production of two capsules containing morphine. (*Ibid.*) The United States Supreme Court reviewed the defendant's conviction based upon a federal due process claim, observing that "[r]egard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.' [Citation.]" (*Id.* at p. 169.) It "conclude[d] that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that

shocks the conscience. . . . [The conduct involves] methods too close to the rack and the screw to permit of constitutional differentiation." (*Id.* at p. 172.) The court therefore held that the conviction obtained by such "brutal and . . . offensive" means violated the federal due process clause. (*Id.* at p. 174.)

 Subsequent decisions of the high court emphasize that extreme governmental conduct is required under *Rochin* to satisfy the "shock the conscience" standard for a violation of substantive due process. (See, e.g., *United States v. Salerno* (1987) 481 U.S. 739, 746 [95 L.Ed.2d 697, 107 S.Ct. 2095] [substantive due process prevents governmental behavior that is conscience-shocking or interferes with rights implicit in concept of ordered liberty]; *Breithaupt v. Abram* (1957) 352 U.S. 432, 435 [1 L.Ed.2d 44, 77 S.Ct. 4088] [conduct must be "so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency"].) *Rochin*'s "shock the conscience" substantive due process standard has been acknowledged by the United States Supreme Court as potentially available to civil litigants claiming that police misconduct constituted a violation of their civil rights under section 1983 of title 42 of the United States Code. (See *Chavez v. Martinez* (2003) 538 U.S. 760, 774 [155 L.Ed.2d 984, 123 S.Ct. 1994]; *County of Sacramento v. Lewis* (1998) 523 U.S. 833, 850 [140 L.Ed.2d 1043, 18 S.Ct. 1708] (*Lewis*).) Numerous cases have cited *Rochin* in that context, and federal circuit courts of appeals have recognized that governmental misconduct that shocks the conscience may serve as a basis for a section 1983 federal civil rights action. (See, e.g., *Stoot v. City of Everett* (9th Cir. 2009) 582 F.3d 910, 928; *Neal ex rel. Neal v. Fulton County Bd. of Education* (11th Cir. 2000) 229 F.3d 1069, 1075; *Morris v. Dearborne* (5th Cir. 1999) 181 F.3d 657, 668; *Haberthur v. City of Raymore, Missouri* (8th Cir. 1997) 119 F.3d 720, 723–724; *Johnson v. Glick* (2d Cir. 1973) 481 F.2d 1028, 1033.)

## 2. *Substantive due process generally*

 The substantive component of the due process clause of the Fourteenth Amendment "bar[s] certain government actions regardless of the fairness of the procedures used to implement them, *e.g., Rochin, supra*, [342 U.S. 165, and] serves to prevent governmental power from being 'used for purposes of oppression,' [citation]." (*Daniels v. Williams* (1986) 474 U.S. 327, 331–332 [88 L.Ed.2d 662, 106 S.Ct. 662].) Substantive due process has "[h]istorically . . . been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property" (*id.* at p. 331), and to prevent "government power arbitrarily and oppressively exercised" (*Lewis, supra*, 523 U.S. at p. 846). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity. [Citation.]" (*Albright v. Oliver* (1994) 510 U.S. 266, 272 [127 L.Ed.2d 114, 114 S.Ct. 807].)

"[T]he [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. [Citation.] The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." (*Collins v. Harker Heights* (1992) 503 U.S. 115, 125 [117 L.Ed.2d 261, 112 S.Ct. 1061] (*Collins*).) In light of this policy, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' (*Graham* v. *Connor* [(1989) 490 U.S. 386,] 395 [104 L.Ed.2d 443, 109 S.Ct. 1865].)" (*Albright v. Oliver, supra*, 510 U.S. at p. 273, fn. omitted; see also *Lewis, supra*, 523 U.S. at p. 842.)

■ The high court has explained that "substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' [citations], and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed,' [citation]. Second, we have required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest. [Citations.]" (*Washington v. Glucksberg* (1997) 521 U.S. 702, 720–721 [138 L.Ed.2d 772, 117 S.Ct. 2258, 117 S.Ct. 2302] (*Glucksberg*).)

### 3. *Analysis of substantive due process argument*

Commencing here with the second feature of substantive due process enunciated by the high court, it is difficult to provide "a 'careful description' of the asserted fundamental liberty interest" (*Glucksberg, supra*, 521 U.S. at p. 721) that the court, through its dismissal order, sought to address here. Defendant does not plainly identify that interest. Indeed, it is unclear that he even asserted a claim of substantive due process below. Defendant initially contended in his February 2009 motion papers that he was denied due process by the prosecutor's deliberate violation of *Brady* in suppressing the SART video prior to and throughout the trial and by conspiring with Dr. Kerns and Ritter to suppress that discovery. In subsequent moving papers filed in October 2009, defendant argued that Benson's outrageous conduct, in addition to his alleged suppression of the SART video during trial, consisted of Benson's (1) misrepresentations to the court prior to the filing of the new trial motion about his claimed lack of knowledge of the video's existence; (2) withholding of his prior knowledge of Ritter's practice of videotaping SART exams and his having sent a video of the alleged victim's SART exam to the defense expert in *Zeledon*; (3) failure to mention his knowledge of the

video of Anna's SART exam in his opposition to the new trial motion; (4) attempts to obtain false declarations from Judge Bernal and Lopez after the case was reversed; (5) filing of an improper discovery motion; and (6) false testimony at the hearing on the motions.

The conduct of Benson that defendant claimed initially in the motion to dismiss to have been outrageous concerned defendant's right to timely discovery of the SART video in this case, a right for which defendant was given redress when we reversed the conviction and granted a new trial due to a *Brady* violation. As expanded in defendant's later filings, Benson's posttrial conduct affected his rights with respect to the presentation of the motion to dismiss itself. However defined, defendant's rights affected by Benson's misconduct cannot be properly considered to be a *"deliberate* decision[] of [a] government official[] to deprive a person of life, liberty, or property." (*Daniels v. Williams, supra*, 474 U.S. at p. 331.) Further, Benson's conduct, however characterized, did not interfere with "fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' [citations], and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed,' [citation]." (*Glucksberg, supra*, 521 U.S. at pp. 720–721.) We therefore do not find the existence of a fundamental liberty interest of defendant that was abridged as a result of prosecutorial misconduct.

■ Moreover, under the more-specific-provision rule of *Graham v. Connor, supra*, 490 U.S. at page 395, defendant may not assert a substantive due process claim if there is a particular amendment providing " 'constitutional protection' against a particular sort of government behavior." (*Albright v. Oliver, supra*, 510 U.S. at p. 273.) The prosecution's obligations under *Brady* are founded on procedural due process considerations. (*United States v. Bagley* (1985) 473 U.S. 667, 675 [87 L.Ed.2d 481, 105 S.Ct. 3375].) And procedural due process guarantees provide a defendant with a right to a fair hearing where, as here, he asserted in his dismissal motion a violation of his constitutional rights. (See, e.g., *Jackson v. Denno* (1964) 378 U.S. 368, 376–377 [12 L.Ed.2d 908, 84 S.Ct. 1774] [defendant's right to fair hearing to assert constitutional challenge concerning voluntariness of confession or admission].) Therefore, since the misconduct of Benson related to defendant's procedural due process rights guaranteed under the Fifth and Fourteenth Amendments, defendant is precluded under the more-specific-provision rule from asserting a substantive due process claim as a basis for the dismissal order. (See 1 LaFave et al., Criminal Procedure (3d ed. 2007) § 2.7(d), pp. 718–719, fn. 248 [application of procedural due process protections in criminal proceedings "is so well established that its availability may also be treated as suggesting restraint in looking beyond it to substantive due process as a constitutional grounding"].)

Defendant cites *People v. Alexander* (2010) 49 Cal.4th 846 [113 Cal.Rptr.3d 190, 235 P.3d 873] (*Alexander*) in support of his substantive due process claim. There, the high court addressed the defendant's contention that he was entitled to dismissal on various theories as a result of a wiretap that resulted in the interception of a confidential telephone call between defendant, his mother, and a defense investigator. (*Id.* at p. 884.) The court rejected the various challenges, holding, inter alia, that the conduct was "not so egregious as to shock the conscience such that [it] was arbitrary in the constitutional sense" (*id.* at p. 892), and rejected the substantive due process challenge "[b]ecause there [was] no evidence of an unjustifiable intent to harm defendant by invading his attorney-client privilege" (*id.* at p. 893). The facts of *Alexander* are distinguishable, and the case does not in any way support the existence of a creditable substantive due process claim here.

As noted, substantive due process is governed by principles of judicial restraint that guard against unjustified expansion into new areas. (*Collins, supra,* 503 U.S. 115, 125; see also *People v. Santos* (2007) 147 Cal.App.4th 965, 978 [55 Cal.Rptr.3d 1] ["courts proceed cautiously when asked to break new ground . . ." under claim of substantive due process].) In the absence of a fundamental liberty interest having been abridged by the prosecutorial misconduct here—and, further, because the more-specific-provision rule (*Graham v. Connor, supra,* 490 U.S. at p. 395) applies—defendant's substantive due process claim fails. Benson's misconduct was certainly conscience-shocking in the sense that it involved false testimony by a prosecutor in a formal criminal proceeding. (See *United States v. Mandujano* (1976) 425 U.S. 564, 576 [48 L.Ed.2d 212, 96 S.Ct. 1768]: "Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings.") But it did not involve "brutal and . . . offensive" conduct employed to obtain a conviction. (*Rochin, supra,* 342 U.S. at p. 174.) Defendant was not entitled to dismissal for outrageous governmental conduct shocking the conscience in violation of substantive due process under Rochin and its progeny.[15]

[15] Defendant also relies on *Commonwealth v. Virtu* (1981) 495 Pa. 59 [432 A.2d 198] (*Virtu*). There, the misconduct involved a prosecutor's calling a witness to testify in a murder trial, knowing that he intended to invoke the privilege against self-incrimination. (*Id.,* 432 A.2d at p. 200.) Before calling the witness, the prosecutor misrepresented to the court that the witness had not invoked the self-incrimination privilege when he had testified at a prior suppression hearing in the case, when in fact the witness had invoked such rights. (*Ibid.*) After the witness invoked those rights at trial and a mistrial was granted, the court denied the defendant's motion to dismiss on double jeopardy grounds. (*Id.* at p. 201.) The state supreme court reversed, holding that the "extraordinary course of prosecutorial overreaching" compelled dismissal. (*Id.* at p. 203.) *Virtu* does not support defendant's position here because it (1) is not precedent we are bound to follow (*Gentis v. Safeguard Business Systems, Inc.* (1998) 60 Cal.App.4th 1294, 1307 [71 Cal.Rptr.2d 122]); (2) was decided under a double jeopardy claim, rather than a substantive due process claim, and *Rochin* was not cited by the Pennsylvania court; (3) is factually distinguishable; and (4) involved misconduct in which the prosecutor made misrepresentations to the court during trial that resulted in significant prejudice to the

## C. *California "Outrageous Conduct" Cases*

Defendant relies on three California cases in which the appellate court either directed or affirmed the trial court's dismissal of criminal proceedings based upon outrageous governmental conduct. (See *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252 [36 Cal.Rptr.2d 210] (*Morrow*); *Boulas, supra,* 188 Cal.App.3d 422; *People v. Moore* (1976) 57 Cal.App.3d 437 [129 Cal.Rptr. 279] (*Moore*).) The appellate court in each of the cases cited *Rochin, supra,* 342 U.S. 165. (*Morrow,* at p. 1259; *Boulas,* at p. 429; *Moore,* at p. 442.) To the extent that these cases are based upon a substantive due process claim, they are of no assistance to defendant because, as discussed, *ante,* no such constitutional claim is viable here. But none of these decisions specifically refers to substantive due process. Accordingly, we will review each of them below and conclude that none of the cases offers justification for dismissal of the information here. Each of the cases involved significant violations of the defendant's constitutional right to counsel causing the defendant substantial prejudice, circumstances not presented here.

In *Moore, supra,* 57 Cal.App.3d 437, the defendant, after his arrest, performed undercover work and testified in an unrelated case in exchange for being released from custody and with the promise that his cooperation would be made known to the court at sentencing. (*Id.* at p. 440.) His attorney was kept in the dark about these arrangements and the prosecutor's investigators instructed defendant not to tell his attorney about his dealings, and falsely told the defendant that his attorney was inadequate and had been disbarred. (*Ibid.*) The defendant did extensive undercover work under the arrangement and investigators gave him bugging equipment, expense money, and a weapon (notwithstanding a weapons-possession parole condition). (*Ibid.*) The defendant was also a material witness for the prosecution in a murder trial (*id.* at pp. 440–441); as a result of that cooperation, he was beaten by four men, had a shotgun fired at him on another occasion, and was the subject of "[t]wo 'contracts' . . . on his life." (*Id.* at p. 441.) The investigator also instructed the defendant not to appear at his own trial and to give his attorney a false telephone number so that he could not reach his client. (*Id.* at p. 440.) The defendant became "so desperate [he] was driven to attempt suicide by hanging himself while in custody on Christmas Eve 1974." (*Id.* at p. 443.) His substituted counsel ultimately made a motion to dismiss the proceeding, which was granted on the basis that the defendant had been "denied due process of law and effective aid of counsel." (*Id.* at p. 441.)

The appellate court affirmed, noting that the defendant had a constitutional right to be represented by counsel throughout the time that charges against

defendant, because the court permitted a witness to be called who the prosecutor knew would invoke the privilege against self-incrimination in testimony before the jury.

him were pending. (*Moore, supra*, 57 Cal.App.3d at p. 441.) The court found that "the People [had] actively interfered with an attorney-client relationship . . ." and that his due process rights had thus been "tainted." (*Id.* at p. 442.) It concluded: "[Due process] . . . is clearly violated when a defendant is denied counsel in criminal proceedings [citations], but may also be denied under circumstances which do not include an outright refusal to provide counsel." (*Ibid.*)

*Moore* is obviously distinguishable. The case involved the prosecution's active and persistent interference with the accused's relationship with his defense attorney. This interference, in addition to violating due process, also infringed upon the defendant's Sixth Amendment right to counsel.[16] Moreover, the court held that the interference with the defendant's relationship with his attorney, aside from jeopardizing the defendant's safety, was prejudicial to him in that the intrusion "relinquished the basis on which he and his counsel might have reached a favorable plea bargain with the district attorney." (*Moore, supra*, 57 Cal.App.3d at p. 441.) The misconduct here did not involve an interference with defendant's relationship with counsel and had no bearing on defendant's ability to receive a fair trial after this court's reversal of his prior conviction.

*Boulas, supra*, 188 Cal.App.3d 422, likewise involved the state's substantial interference with the accused's relationship with his attorney. The defendant, charged with two counts of selling cocaine, hired an acquaintance as his unlicensed investigator to approach the authorities about a plea bargain. (*Id.* at pp. 425–426.) In a meeting arranged by the investigator, the defendant told a deputy sheriff that he could provide information about major cocaine dealers in exchange for leniency at sentencing. (*Id.* at p. 426.) The deputy discussed the matter with the district attorney, who indicated that a deal would be possible only if the defendant fired his attorney and replaced him with someone acceptable; the deputy relayed this condition to the defendant. (*Id.* at pp. 426–427.) The defendant complied by firing his attorney without telling him his reason for doing so. (*Id.* at p. 427.) The investigator communicated with the deputy, who steered the defendant to a specific attorney whom the district attorney deemed acceptable. (*Ibid.*) After the defendant contacted that attorney, the latter spoke with the district attorney and, after learning that his potential client would be working as an informant, declined the engagement. (*Id.* at pp. 427–428.) The defendant, now unrepresented, continued to work with the authorities and provided significant information about other drug

---

[16] Although the Sixth Amendment was not expressly identified by the court in *Moore*, the court emphasized that the state had interfered with the defendant's right to counsel and cited a landmark case (*Gideon v. Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792]) in which the Supreme Court held that a defendant's Sixth Amendment right to assistance of counsel applied to the states under the Fourteenth Amendment. (*Moore, supra*, 57 Cal.App.3d at p. 442.)

dealers. (*Id.* at p. 428.) After the district attorney told the defendant, via the deputy, that a deal was no longer possible, the defendant retained a third attorney, who filed a motion to dismiss. (*Ibid.*) The trial court found that the deputy had deliberately interfered with the defendant's relationship with his attorney and clearly violated the defendant's right to counsel, but denied the motion because it found the defendant was not prejudiced by the misconduct. (*Id.* at p. 429.)

The appellate court granted a writ of mandate compelling the court to dismiss the information. (*Boulas, supra,* 188 Cal.App.3d at p. 435.) After emphasizing the importance of a criminal defendant's right to effective assistance of counsel at all stages of the proceedings, the court found that the government's conduct "effectively short-circuited Boulas's right to be assisted by counsel at a critical stage of the proceedings. . . . [Citation.] It is highly probable that conversations outside the presence of counsel may have served to impede whatever opportunity defense counsel would otherwise have had to secure a plea bargain. [Citation.]" (*Id.* at p. 433.) The appellate court concluded that the actions of the deputy sheriff and deputy district attorney "actively caused irremediable harm to Boulas's relationship with his attorney" (*ibid.*) and constituted a "subversion of Boulas's rights" (*id.* at p. 434). (See also *id.* at p. 435 ["Boulas was seriously prejudiced as a result of the improper governmental intrusion . . . ."].) It therefore found "the government conduct . . . to [have been] outrageous in the extreme, and shocking to the conscience; we are, thereby, compelled to order the dismissal of the present case." (*Id.* at p. 434.)

*Boulas* has no application. There, "the grave sanction of dismissal" (*Boulas, supra,* 188 Cal.App.3d at p. 434) was found to be warranted "to discourage government officials from interfering with the constitutional right of an accused to be assisted by counsel of his own choosing." (*Id.* at p. 435.) Here the misconduct did not involve in any way an interference with defendant's relationship with counsel.

*Morrow, supra,* 30 Cal.App.4th 1252, is the case defendant describes as "speak[ing] most directly to our factual situation." In *Morrow,* on the day of trial, the deputy district attorney told defense counsel that her client had no defense because an alibi witness had recanted; the prosecutor said if the defendant did not plead guilty, she would seek a delay of trial due to a planned skiing vacation. (*Id.* at p. 1255.) While defense counsel conferred in a holding area with the defendant, who was in custody, the prosecutor directed her investigator to station herself close by to listen in on the conversation. (*Ibid.*) The courtroom bailiff later testified that the investigator had appeared to be eavesdropping. (*Ibid.*) After the conversation ended, the investigator returned to the prosecutor and whispered something to her. (*Ibid.*)

The trial court granted the prosecutor's motion to continue over the defendant's objection. (*Ibid.*) After investigations were initiated by the prosecutor's office and the Attorney General, the defendant moved to dismiss based upon prosecutorial misconduct. (*Id.* at p. 1256.) During an evidentiary hearing, both the prosecutor and investigator exercised the right to remain silent and asserted the privilege against self-incrimination; the court held that, while the eavesdropping occurred and confidential matters were discussed, there was no evidence that the investigator overheard any essential matters and therefore dismissal was inappropriate. (*Id.* at pp. 1257–1258.)

The Court of Appeal issued a writ of mandate compelling the trial court to dismiss the proceeding. (*Morrow, supra*, 30 Cal.App.4th at p. 1263.) It found that the actions of the prosecutor and investigator violated an array of the defendant's federal and state constitutional rights, including his privilege against self-incrimination, right to counsel, right of privacy, and right to due process. (*Id.* at p. 1259.) It found that the misconduct and attendant violations of the defendant's federal and state constitutional rights "[shocked its] conscience," the eavesdropping of confidential attorney-client communications constituted "a 'substantial threat of demonstrable prejudice' as a matter of law," and therefore dismissal was warranted. (*Id.* at p. 1261.)

*Morrow* likewise has no application to the case before us. The prosecutor there committed "egregious" (*Morrow, supra*, 30 Cal.App.4th at p. 1260) acts that violated the defendant's federal and state constitutional rights, including his right to counsel. Given the fact that the investigator, at the prosecutor's behest, intercepted confidential communications between the defendant and his attorney, the court found the existence of "a 'substantial threat of demonstrable prejudice' as a matter of law." (*Id.* at p. 1261.) Here, while Benson's conduct of testifying untruthfully constituted a substantial affront to the court, it did not violate defendant's constitutional right to effective assistance of counsel. Further, the misconduct did not prejudice defendant, or pose "a 'substantial threat of demonstrable prejudice' as a matter of law" (*ibid.*)—and the trial court found no such prejudice or a substantial threat thereof—with respect to the pending retrial of the criminal charges. *Morrow* does not offer support for defendant's position here.[17]

---

[17] A fourth case, *Barber v. Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818] (*Barber*), also involved a dismissal based upon the government's significant intrusion into the attorney-client relationship in relation to the criminal trespass prosecution of approximately 50 demonstrators at the Diablo Canyon nuclear power plant. Two undercover agents posed as demonstrators and one attended numerous joint meetings between the defendants and their counsel. (*Id.* at p. 748.) The high court concluded that the defendants' state constitutional right to counsel had been significantly and prejudicially abridged by this improper governmental conduct (*id.* at p. 756), and the court held that permitting the cases "to proceed to trial under these circumstances would be contrary to basic notions of fair play and simple justice" (*ibid.*). The high court, however, did not cite *Rochin* or rely on a substantive

## D. *Showing of Prejudice Required for Dismissal*

Having addressed defendant's substantive due process claim and his misplaced reliance on the three California "outrageous conduct" cases discussed, *ante*, we consider whether the sanction of dismissal for the prosecutorial misconduct here was appropriate in light of relevant United States Supreme Court and California authorities.

In *Smith v. Phillips* (1982) 455 U.S. 209, 212–213 [71 L.Ed.2d 78, 102 S.Ct. 940], the high court addressed a claim that the defendant had been denied due process because of the prosecution's failure to disclose the fact that a juror had an application pending with the district attorney's office for a job as an investigator. After the defendant's conviction, the federal district court granted habeas corpus relief, concluding that bias on the part of the juror would be imputed, notwithstanding the lack of evidence of actual bias. (*Id.* at p. 214.) After the court of appeals affirmed, the Supreme Court reversed. (*Id.* at p. 221.)

■ The high court observed that "[p]ast decisions of this Court demonstrate that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." (*Smith v. Phillips, supra*, 455 U.S. at p. 219; see also *In re Price* (2011) 51 Cal.4th 547, 560 [121 Cal.Rptr.3d 572, 247 P.3d 929] [quoting *Smith v. Phillips*].) It noted that it had held in *Brady v. Maryland, supra*, 373 U.S. at page 87, that a due process violation was established where the prosecutor suppressed requested evidence material to guilt or punishment, regardless of the prosecutor's good or bad faith, thus focusing on the materiality of the suppressed evidence. (*Smith v. Phillips*, at p. 219; see also *Moore v. Illinois* (1972) 408 U.S. 786, 794 [33 L.Ed.2d 706, 92 S.Ct. 2562] [*Brady* claim will succeed where evidence suppressed "is favorable to the accused and is material either to guilt or to punishment"].) The court stated that "the aim of due process 'is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.' [Citation.]" (*Smith v. Phillips, supra*, at p. 219, quoting *Brady*, at p. 87.) In reviewing some of its decisions on prosecutorial misconduct, including ones where the misconduct was egregious, the high court explained that the critical due process inquiry was the effect of the misconduct on the trial, not the nature or blameworthiness of the misconduct itself. (*Smith v. Phillips*, at p. 220 & fn. 10.) It therefore held that the appellate court "erred when it concluded that prosecutorial misconduct alone requires a new trial. We do not condone the conduct of the prosecutors in this case. Nonetheless, . . . [the juror's] conduct

due process analysis in reaching its conclusion, and defendant, while citing *Barber* on the basis that it was "similarly reasoned" as *Moore, Boulas*, and *Morrow*, acknowledges that *Barber* was not a due process case.

did not impair his ability to render an impartial verdict. The trial judge expressly so found. [Citation.] [¶] Therefore, the prosecutors' failure to disclose [the juror's] job application, although requiring a post-trial hearing on juror bias, did not deprive respondent of the fair trial guaranteed by the Due Process Clause." (*Id.* at pp. 220–221.)

In *United States v. Valenzuela-Bernal* (1982) 458 U.S. 858 [73 L.Ed.2d 1193, 102 S.Ct. 3440] (*Valenzuela-Bernal*), the Supreme Court considered whether the defendant, convicted of knowing transportation of illegal aliens, was deprived of due process and his right to compulsory process of witnesses under the Sixth Amendment. After his conviction was overturned by the Ninth Circuit Court of Appeals on these constitutional grounds because two persons were deported by the government before trial (*Valenzuela-Bernal*, at p. 860), the high court reversed, concluding that a violation of the due process or compulsory process clauses of the Fifth and Sixth Amendments, respectively, was not established because there was no showing of prejudice to the defendant, i.e., "some showing that the evidence lost would be both material and favorable to the defense." (*Valenzuela-Bernal*, at p. 873; see also *People v. Jacinto* (2010) 49 Cal.4th 263, 270 [109 Cal.Rptr.3d 610, 231 P.3d 341].) After considering prior authorities requiring prejudice to establish due process violations in the context of *Brady* violations and preindictment and postindictment delay claims (*Valenzuela-Bernal*, at pp. 868–869), the court concluded that the defendant was required to show the benefit he would have received from the testimony of the deported witnesses (*id.* at p. 871), explaining: "Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.' [Citation.]" (*Id.* at p. 872, quoting *Lisenba v. California* (1941) 314 U.S. 219, 236 [86 L.Ed. 166, 62 S.Ct. 280].)

Our state's high court considered the proper remedy for state misconduct in *People v. Zapien* (1993) 4 Cal.4th 929 [17 Cal.Rptr.2d 122, 846 P.2d 704]. There, the prosecutor found a cassette tape belonging to defense counsel, gave it to a deputy sheriff, and asked him to listen to it and report on its contents. (*Id.* at p. 961.) Instead, the deputy discarded the tape without listening to it. (*Ibid.*) Defense counsel later advised the court that the tape was a recording of his dictation, later transcribed, describing the strengths and weaknesses of the case. (*Id.* at p. 962.) The trial court denied the defendant's motion to dismiss the charges. (*Ibid.*) The high court rejected the defendant's claim of error. It noted that the defendant did "not assert he was harmed by the destruction of the contents of the tape recording." (*Id.* at p. 963.) Although the court found the deputy's conduct highly improper (*id.* at p. 964), the misconduct "did not deprive defendant of due process of law or otherwise deny defendant a fair trial." (*Id.* at p. 965.) The court held that

notwithstanding the misconduct, because the defendant was not prejudiced by the destruction of the tape, "[i]t would have been inappropriate . . . to impose sanctions for the destruction of the contents of the tape recording, particularly the severe sanction of dismissal. '[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation [of the defendant's right to counsel] may have been deliberate . . . .' [Citation.]" (*Id.* at p. 967, fn. omitted, quoting *United States v. Morrison* (1981) 449 U.S. 361, 365 [66 L.Ed.2d 564, 101 S.Ct. 665] (*Morrison*).)

The requirement of a prejudice showing is not limited to claims founded on alleged procedural due process violations. In *Morrison, supra,* 449 U.S. at page 362, after the defendant had been indicted and had retained counsel, two agents contacted her without counsel's knowledge or permission. They sought her cooperation in a related investigation and disparaged her counsel; she declined the invitation and notified her attorney of the agents' overtures. (*Ibid.*) The high court rejected the defendant's contention that the state had infringed on her Sixth Amendment right to counsel and that this misconduct warranted dismissal, noting that she had failed to show any prejudice resulting from this misconduct (449 U.S. at p. 366), and that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate. This has been the result reached where a Fifth Amendment violation has occurred, and we have not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment." (*Id.* at pp. 365–366, fns. omitted.)

The California Supreme Court has likewise held that prejudice must be shown to establish that a violation of a defendant's Sixth Amendment right to counsel warrants dismissal. (See *Alexander, supra,* 49 Cal.4th at p. 891 [no showing of "realistic possibility that defendant was injured by, or the prosecution benefited from, the monitoring and recording of the three-way call"]; *People v. Ervine* (2009) 47 Cal.4th 745, 767–768 [102 Cal.Rptr.3d 786, 220 P.3d 820] [no showing of prejudice, namely, that intercepted privileged communication was relayed to prosecution team].) California Courts of Appeal are in accord. (See, e.g., *People v. Benally* (1989) 208 Cal.App.3d 900, 909 [256 Cal.Rptr. 483]; *People v. Tribble* (1987) 191 Cal.App.3d 1108, 1118–1120 [236 Cal.Rptr. 733]; *People v. Glover* (1985) 169 Cal.App.3d 689, 697–700 [215 Cal.Rptr. 456].) And based on the same set of facts upon which it rejected the defendants' Sixth Amendment claims, the high court has also rejected procedural due process claims due to the absence of prejudice. (See *Alexander,* at p. 891 ["interception of the call did not make defendant's trial fundamentally unfair"]; *People v. Ervine,* at p. 771 [procedural due process claim likewise rejected because no showing that conduct "undermined the fundamental fairness of the trial"].)

The misconduct here involves a deputy district attorney's deception toward opposing counsel and the trial judge, and his providing false testimony at an ancillary hearing. It obviously differs from the alleged state misconduct—prosecutorial misconduct (nondisclosure of facts showing potential juror bias), prosecutorial suppression of requested evidence, action potentially interfering with a defendant's compulsory process rights (deportation of witnesses), destruction of evidence, and interference with the attorney-client relationship—in the cases described above. But there is no reason that the requirement of prejudice should be abandoned where, as here, the prosecutorial misconduct has substantially less connection to the criminal prosecution of defendant than the cases cited above. It is a fundamental principle that reversal for prosecutorial misconduct is not required unless the defendant can show that he has suffered prejudice. (*People v. Arias* (1996) 13 Cal.4th 92, 161 [51 Cal.Rptr.2d 770, 913 P.2d 980]; see also *In re Martin* (1987) 44 Cal.3d 1, 54 [241 Cal.Rptr. 263, 744 P.2d 374] [dismissal unwarranted where no showing that prosecutorial misconduct "prejudiced the defense by undermining the defendant's ability to mount a defense"].) It would be anomalous indeed to permit the dismissal of criminal proceedings with no showing that the prosecutorial misconduct—whether in bad faith or not—prejudiced the defendant, while, on the other hand, requiring such a prejudice showing for reversal of a conviction.

Likewise, since due process considerations require examination of the fairness of the trial rather than the blameworthiness of the prosecutor (*Smith v. Phillips, supra*, 455 U.S. at pp. 219, 220, fn. 10; see also *People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820]), the court may not properly ignore the impact of the prosecutorial misconduct upon defendant's fair trial rights by imposing the severe sanction of dismissal based solely on the egregiousness of the conduct. This would "punish[] . . . society for [the] misdeeds of a prosecutor" rather than "avoid[] . . . an unfair trial to the accused." (*Brady, supra*, 373 U.S. at p. 87.)

The governmental conduct here consisted of the actions of a single deputy district attorney, Benson, who is no longer trial counsel, in (1) soliciting untruthful declarations from his adversary and the trial judge apparently to benefit Benson's State Bar investigation; (2) making misleading statements to the trial judge and his adversary concerning the discovery of the SART exam, also apparently in furtherance of Benson's personal objectives regarding the State Bar investigation; and (3) providing false testimony in the hearing on defendant's motions. It was this "egregious prosecutorial misconduct committed *following reversal* for a *Brady* violation" that the court held warranted dismissal of the information. (Original italics.) The court did not identify or explain in what manner this prosecutorial misconduct impacted defendant, i.e., deprived him of his constitutional due process rights. There was no showing that Benson's misconduct prevented defendant from receiving a fair

retrial or otherwise prejudiced his rights. The court itself indicated that Benson's false testimony was provided in "an ancillary proceeding." Indeed, defendant in his responding brief identifies no such prejudice, instead arguing that no showing was required to support dismissal of the information. The misconduct instead appears to have been a failed attempt by Benson to thwart defendant's efforts to obtain a dismissal of the information. Although the harm from Benson's acts—as a significant insult to the dignity of the judicial system itself—was manifest, its impact on defendant, in the form of depriving him of his constitutional right to a fair trial, was absent.

■ The Supreme Court has enunciated a tailored-remedy approach in connection with the abridgment of an accused's Sixth Amendment right to counsel: "[W]ithout detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests. . . . [¶] Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial." (*Morrison, supra,* 449 U.S. at pp. 364–365; see also *In re Alvernaz* (1992) 2 Cal.4th 924, 942 [8 Cal.Rptr.2d 713, 830 P.2d 747].) Because a due process inquiry focuses on the prejudice of the misconduct on the defendant's fair trial right, applying this "tailored" remedy approach here would give consideration to both the impact of the misconduct on the defendant's rights and the interests of society in prosecuting serious crimes. (Cf. *People v. Conrad, supra,* 145 Cal.App.4th at pp. 1185–1186 [holding that court may address prosecutorial delay resulting in loss of defense evidence by remedy that considers both impact of loss of evidence and state's concern of allowing prosecution to proceed, citing *People v. Zamora* (1980) 28 Cal.3d 88 [167 Cal.Rptr. 573, 615 P.2d 1361]].)

The trial court's dismissal of the information here considered only the prosecutorial misconduct without regard to its impact on defendant. The court failed to tailor the remedy to the harm caused by the misconduct, and gave no consideration to societal interests in having those who have committed serious crimes being brought to justice. (See *People v. Shrier* (2010) 190 Cal.App.4th 400, 418 [118 Cal.Rptr.3d 233] [reversing dismissal of complaint alleging wide scale Medi-Cal fraud based upon state agents' intentional

eavesdropping on attorney-client communications, noting the "critical importance to society" of the prosecution of the crimes at issue].)

■ Defendant contends that this case presents a different species of prosecutorial misconduct for which, in fashioning a remedy, the court should ignore the impact of the misconduct on defendant's right to a fair trial. This assertion is without merit. We thus conclude that the court was not empowered to dismiss the information based upon the prosecutorial misconduct it found to have occurred, absent a showing (and finding by the court) of its significant impact on defendant, namely, that the misconduct prevented him from receiving a fair retrial.[18]

### E. *Ninth Circuit Court of Appeals Decisions*

Although the court below acknowledged that there was no federal authority that addressed dismissal under the circumstances presented here, it cited five decisions of the Ninth Circuit Court of Appeals in support of its conclusion that dismissal was appropriate: *U.S. v. Blanco* (9th Cir. 2004) 392 F.3d 382 (*Blanco*); *U.S. v. Bernal-Obeso* (9th Cir. 1993) 989 F.2d 331 (*Bernal-Obeso*); *U.S. v. Barrera-Moreno* (9th Cir. 1991) 951 F.2d 1089 (*Barrera-Moreno*); *U.S. v. Restrepo* (9th Cir. 1991) 930 F.2d 705 (*Restrepo*); and *U.S. v. Simpson* (9th Cir. 1987) 813 F.2d 1462 (*Simpson I*). Defendant similarly relies on these cases and notes further that those decisions relied on language of the United States Supreme Court in *United States v. Russell* (1973) 411 U.S. 423 [36 L.Ed.2d 366, 93 S.Ct. 1637] (*Russell*).

■ We observe initially that while federal authority may be regarded as persuasive, California courts are not bound by decisions of federal district courts and courts of appeals. (*People v. Zapien, supra,* 4 Cal.4th at p. 989; see also *People v. Seaton* (2001) 26 Cal.4th 598, 653 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].) We nonetheless address the Ninth Circuit authority relied on by the trial court after a brief description of *Russell, supra,* 411 U.S. 423.

---

[18] The trial court cited *Sons v. Superior Court* (2004) 125 Cal.App.4th 110 [22 Cal.Rptr.3d 647] (*Sons*) in its dismissal order. *Sons* concerned primarily whether the prosecution's failure to disclose exculpatory evidence in the defendant's first trial, which misconduct ultimately led to the granting of a federal habeas corpus petition, barred the prosecution from retrying the defendant under double jeopardy principles. The appellate court rejected the defendant's double jeopardy claim (*id.* at pp. 120–121), and observed in passing that while the misconduct did not warrant dismissal on due process grounds, the defendant was not precluded from renewing a motion to dismiss or for other sanctions during the retrial, in the event "evidentiary and instructional sanctions [proved] insufficient to secure Sons a fair trial." (*Id.* at p. 121.) As defendant here himself acknowledges, the *Sons* court did not cite *Rochin, supra,* 342 U.S. 165, and he agrees that any reliance on *Sons* in support of the dismissal order is unfounded.

### 1. *United States v. Russell*

In *Russell, supra,* 411 U.S. at page 424, the defendant was convicted of five counts related to the manufacture and sale of methamphetamine, the jury having rejected his defense of entrapment. The United States Supreme Court, in rejecting the defendant's contention that the level of involvement of law enforcement in the undercover operation leading to his arrest was so extensive that it should bar his prosecution, issued oft-cited dictum acknowledging the possibility that a criminal defendant might make a successful claim of outrageous police conduct defense in an extreme case: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. Cal. Penal Code 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205] . . . ." (*Russell,* at pp. 431–432.) The high court nonetheless reinstated the defendant's conviction, concluding that "[t]he law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment. [Citation.]" (*Id.* at p. 432; see also *Hampton v. United States* (1976) 425 U.S. 484, 489–490 [48 L.Ed.2d 113, 96 S.Ct. 1646] [rejecting defense claim of outrageous conduct under *Russell* dictum, where government supplied contraband to the defendant enabling him to sell it, because conduct was not outrageous and the defendant's predisposition to commit the crime precluded entrapment defense].)

The *Russell* dictum has been cited by the California Supreme Court several times in entrapment and prosecutorial misconduct cases; the high court, however, has not found in any particular case that outrageous governmental conduct violating due process acted as a bar to prosecution of the case. (See *People v. Smith* (2003) 31 Cal.4th 1207, 1223–1227 [7 Cal.Rptr.3d 559, 80 P.3d 662] [because officers' conduct in investigation of robbery ring was "entirely unexceptionable," court declined to resolve whether *Russell* doctrine applies in context of California entrapment cases]; *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 570 [28 Cal.Rptr.2d 638, 869 P.2d 1163] [assuming arguendo *Russell* doctrine applied, use of underage decoys to enforce liquor laws was not outrageous conduct]; *In re Martin, supra,* 44 Cal.3d at p. 55 [assuming prosecutorial misconduct was constitutional violation, it was not outrageous].)[19] Further, in *Alexander, supra,* 49 Cal.4th at page 891, the high court, although not expressly mentioning

---

[19] In an early entrapment case, our high court, without citing *Russell* in particular, observed in dictum: "Sufficiently gross police misconduct could conceivably lead to a finding that conviction of the accused would violate his constitutional right to due process of the law. [Citation.]" (*People v. McIntire* (1979) 23 Cal.3d 742, 748, fn. 1 [153 Cal.Rptr. 237, 591 P.2d 527].)

*Russell*, rejected a claim that an officer's monitoring and recording of a potentially privileged telephone call violated the defendant's due process right to a fair trial, and concluded that the conduct did not result in the trial being "fundamentally unfair." And California appellate courts have similarly cited *Russell* in considering and rejecting outrageous conduct claims in entrapment cases. (See, e.g., *People v. Wesley* (1990) 224 Cal.App.3d 1130, 1142–1145 [274 Cal.Rptr. 326]; *People v. Towery* (1985) 174 Cal.App.3d 1114, 1133–1137 [220 Cal.Rptr. 475]; *People v. Peppars* (1983) 140 Cal.App.3d 677, 685–687 [189 Cal.Rptr. 879].)

### 2. *Ninth Circuit "outrageous conduct" decisions*

The Ninth Circuit has held that the court may dismiss an indictment based upon outrageous governmental conduct that constitutes a violation of due process. (*U.S. v. Bogart* (9th Cir. 1986) 783 F.2d 1428, 1431–1433; see also *Simpson I, supra*, 813 F.2d at pp. 1464–1465.) This principle is founded on the Supreme Court's dictum in *Russell, supra*, 411 U.S. at pages 431–432. But in none of the five cases cited by the trial court did the Ninth Circuit either affirm a dismissal order or reverse a judgment of conviction with instructions to dismiss the indictment. In two instances, the Ninth Circuit reversed an order of dismissal based on governmental outrageous conduct (see *Barrera-Moreno, supra*, 951 F.2d 1089; *Simpson I, supra*, 813 F.2d 1462), and in one case it affirmed the judgment of conviction, concluding that the trial court had not erred in denying the defendant's motion to dismiss for outrageous governmental conduct (*Restrepo, supra*, 930 F.2d 705). In the other cases, the Ninth Circuit vacated the judgment of conviction due to the apparent existence of *Brady* and *Giglio*[20] violations, and remanded the case to the trial court to conduct further proceedings and to order an appropriate remedy—ranging from the reinstatement of the judgment of conviction to dismissal due to outrageous governmental conduct—based upon its factual findings. (See *Blanco, supra*, 392 F.3d at pp. 394–395; *Bernal-Obeso, supra*, 989 F.2d at pp. 336–337.)

The Ninth Circuit has acknowledged that "the due process channel which Russell kept open is a most narrow one . . . ." (*U.S. v. Ryan* (9th Cir. 1976) 548 F.2d 782, 789; see also *Simpson I, supra*, 813 F.2d at p. 1465.) "In short, a defendant must meet an extremely high standard." (*U.S. v. Smith* (9th Cir. 1991) 924 F.2d 889, 897 [holding that "Government's involvement must be *malum in se* or amount to the engineering and direction of the criminal enterprise from start to finish"].)

---

[20] *Giglio v. United States* (1972) 405 U.S. 150, 153–154 [31 L.Ed.2d 104, 92 S.Ct. 763].

The outrageous conduct cases decided by the Ninth Circuit, including those cited by the court below, have involved governmental misconduct qualitatively very different from the prosecutorial misconduct here. In the main, those cases addressed misconduct—often not sufficiently outrageous to warrant a finding of a due process violation—relating to an investigation leading to the defendant's arrest. (See, e.g., *Barrera-Moreno, supra*, 951 F.2d at p. 1092 [government's allowance of informant's illegal behavior, including his supplying the defendants with illegal drugs, not outrageous conduct violating due process]; *U.S. v. Smith, supra*, 924 F.2d at p. 897 [informant's encouragement of 18-year-old patient in drug rehabilitation facility to traffic cocaine not outrageous conduct]; *Simpson I, supra*, 813 F.2d at pp. 1465–1470 [government's utilization of heroin user, prostitute, and fugitive from justice as informant, with knowledge of development of sexual relationship between her and the defendant, not outrageous conduct violating due process].) As noted in *Simpson I, supra*, at page 1470, the inquiry into whether the government's involvement in the operation is so pervasive that the conduct is outrageous is sometimes described as the " 'government-manufactured crime' test." (See also *U.S. v. Smith*, at p. 897 [governmental conduct must amount to the "engineering and direction of [a] criminal enterprise from start to finish"].) And in order to warrant dismissal of the indictment, where the outrageous conduct is prosecutorial misconduct, the Ninth Circuit has required that it have "(1) . . . [been] flagrant, [citation], and (2) caused substantial prejudice to the defendant. [Citation.]" (*U.S. v. Jacobs* (9th Cir. 1988) 855 F.2d 652, 655 (*Jacobs*).)

The conduct here—in contrast to the alleged misconduct considered by the Ninth Circuit in most of the outrageous conduct cases—had nothing to do with the investigation that ultimately ensnared defendant in this prosecution. The prosecutorial misconduct, as identified by the court, consisted of Benson's (1) "weav[ing] a tangled web of deceit" after becoming aware of the existence of the video of Anna's SART exam by seeking false declarations from Judge Bernal and Lopez, by attempting to mislead Judge Bernal, and by "attempt[ing] to initiate improper ex parte communications with that judge" and (2) giving "untruthful testimony . . . during an ancillary proceeding," namely, the hearing on the recusal and dismissal motions. As discussed above, the court did not identify or explain in what manner this prosecutorial misconduct impacted defendant, i.e., deprived him of his constitutional due process rights, and there was no evidence of prejudice presented. As such, the prosecutorial misconduct the court sanctioned here did not come within the "most narrow" "due process channel" described by the Ninth Circuit. (*U.S. v. Ryan, supra*, 548 F.2d at p. 789.) We therefore conclude that the Ninth Circuit precedent relied on by the court does not support dismissal of the information based upon outrageous conduct constituting a violation of due process.

### F. Court's Supervisory Powers

Defendant argues alternatively that the court's dismissal order was justified "as a proper application of its supervisory powers." Although the basis for the trial court's decision is unclear, it cited Ninth Circuit precedent which recognizes the concept that federal courts have the supervisory power to dismiss a criminal case in certain instances. It may be reasonably inferred, therefore, that the court relied on the concept of supervisory powers in dismissing the information. Further, although defendant does not elaborate on his position—and cites only one authority, a civil case, in support of his argument (*Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736 [66 Cal.Rptr.3d 268] (*Slesinger*))—he seemingly contends that, irrespective of federal case law, the supervisory powers of California courts include the right to dismiss a criminal case under the circumstances before us. We will address the issue of a court's supervisory powers by examining both the Ninth Circuit cases relied on by the court below and authority dealing with the supervisory powers of California courts.

#### 1. Ninth Circuit authority—courts' supervisory powers

The Ninth Circuit recognizes a category of cases in which the outrageous governmental conduct, although falling short of constituting a deprivation of due process, may warrant the dismissal of the indictment under the court's supervisory powers. (See, e.g., *Barrera-Moreno, supra*, 951 F.2d at p. 1091; *Restrepo, supra*, 930 F.2d at p. 712.) This category of cases—which the Ninth Circuit has found to be rooted in the Supreme Court's holding in *United States v. Hasting* (1983) 461 U.S. 499 [76 L.Ed.2d 96, 103 S.Ct. 1974] (*Hasting*)[21]—permits the court to dismiss an indictment under its supervisory powers under three circumstances: "[1] to implement a remedy for the violation of a recognized statutory or constitutional right; [2] to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and [3] to deter future illegal conduct. [Citations.]" (*U.S. v. Simpson* (9th Cir. 1991) 927 F.2d 1088, 1090 (*Simpson II*).)

■ We note that the supervisory powers doctrine, as explained by the Supreme Court, is grounded in the powers available to *federal* courts. (*Hasting, supra*, 461 U.S. at p. 506.) As such, it has no application to the court's decision here. We find nonetheless that the doctrine, even were it one that could be borrowed by California courts, does not justify the dismissal order here.

---

[21] The high court in *Hasting, supra*, 461 U.S. 499, did not address whether the court could exercise its supervisory powers to dismiss an indictment as a sanction for outrageous governmental conduct not constituting a due process violation. We therefore express no opinion on whether the Ninth Circuit correctly interpreted *Hasting* as authorizing the court under its supervisory powers to dismiss an indictment under those circumstances.

The Ninth Circuit has acknowledged that dismissal of an indictment for outrageous governmental conduct under the court's supervisory powers is a "drastic step" and thus "is a disfavored remedy." (*Jacobs, supra,* 855 F.2d at p. 655; see also *U.S. v. Struckman* (9th Cir. 2010) 611 F.3d 560, 577 (*Struckman*).) As the Ninth Circuit has explained: "The doctrine of separation of powers requires judicial respect for the independence of the prosecutor. [Citation.] Dismissing an indictment with prejudice encroaches on the prosecutor's charging authority, substituting a judicial wag-of-the-finger for the prosecutorial nod. Such an intrusion will be permitted only in cases of flagrant prosecutorial misconduct. [Citations.]" (*Simpson II, supra,* 927 F.2d at p. 1091; see also *Struckman,* at p. 578 [courts addressing governmental misconduct "can only assure that the misconduct does not give the government an advantage in obtaining a conviction"].)

Under the first basis for the court's exercise of its supervisory powers—namely, "to implement a remedy for the violation of a recognized statutory or constitutional right" (*Simpson II, supra,* 927 F.2d at p. 1090)—"[d]ismissal is appropriate when the investigatory or prosecutorial process has violated a federal constitutional or statutory right and no lesser remedial action is available." (*Barrera-Moreno, supra,* 951 F.2d at p. 1092.) Assuming the court relied on this first ground for exercising its supervisory powers in dismissing the information, we discern nothing in the record indicating the court gave consideration to the availability of remedial action less drastic than dismissal.

The court's use of its supervisory powers to dismiss an indictment "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury" (*Simpson II, supra,* 927 F.2d at p. 1090) is proper only when the prosecutorial misconduct (such as a prosecutor's misrepresentation to the court) is "flagrant behavior" causing "substantial prejudice to defendants. [Citation.]" (*Barrera-Moreno, supra,* 951 F.2d at p. 1093 [no prejudice because misrepresentations of prosecutor occurred after jury verdict and could not have influenced jury]; see also *U.S. v. Ross* (9th Cir. 2004) 372 F.3d 1097, 1110; *Jacobs, supra,* 855 F.2d at p. 655.) In the context of prosecutorial misconduct involving grand jury proceedings, the Supreme Court has held "as a general matter, a district court may not dismiss an indictment [under its supervisory powers] for errors in grand jury proceedings unless such errors prejudiced the defendants." (*Bank of Nova Scotia v. United States* (1988) 487 U.S. 250, 254 [101 L.Ed.2d 228, 108 S.Ct. 2369]; see also *id.* at pp. 254–255.) Similarly, a court may sanction prosecutorial misconduct in the form of a *Brady* violation by dismissing the indictment only when the violation is flagrant and substantially prejudicial to the defendant, and where no lesser remedial action is available. (*U.S. v. Chapman* (9th Cir. 2008) 524 F.3d 1073, 1086–1087 (*Chapman*); see also *Struckman, supra,* 611 F.3d at p. 577.)

Here, we will assume that the prosecutorial misconduct identified by the court was flagrant. Nonetheless, there was no showing—nor was there a finding by the court—that the misconduct caused substantial prejudice to defendant. Thus, because of the absence of prejudice, dismissal was unnecessary to "ensur[e] that [any subsequent] conviction rests on appropriate considerations validly before a jury." (*Simpson II, supra,* 927 F.2d at p. 1090.)

As a third basis under its supervisory powers (in the view of the Ninth Circuit), the court may fashion a remedy that deters future illegal conduct, including dismissal of the indictment. (*Simpson II, supra,* 927 F.2d at pp. 1090, 1091.) Here, there was no finding by the trial court of systemic intentional misconduct on the part of the district attorney's office. The intentional misconduct sanctioned by the court was that of Benson alone.[22] Since Benson was no longer trial counsel, it is difficult to see how dismissal of the information acted as a remedy to deter future misconduct; rather, it was an extreme sanction for Benson's prior misconduct in soliciting declarations from Judge Bernal and Lopez, in attempting to mislead the former, and in giving false testimony at the hearing. Dismissal under the court's supervisory powers is appropriate only when "the defendant suffers 'substantial prejudice,' [citation], and where 'no lesser remedial action is available,' *Barrera-Moreno,* [*supra,*] 951 F.2d at [page] 1092." (*Chapman, supra,* 524 F.3d at [p.] 1087.) Here, defendant was not substantially prejudiced by Benson's misconduct, and less drastic remedies to address the misconduct—e.g., contempt, referral to the State Bar for possible disciplinary proceedings, and initiation of a perjury investigation—were available. (See *Hasting, supra,* 461 U.S. at p. 506 & fn. 5 [reversal of conviction for prosecutorial misconduct improper where more narrowly tailored remedies, such as disciplinary proceedings, were available]; see also *Simpson II, supra,* 927 F.2d at p. 1092 (conc. opn. of Nelson, J.) [court's dismissal under supervisory powers "is based on a combination of the egregiousness of a prosecutor's present misconduct, the need to discipline him for past misconduct, and the effectiveness of any other available sanctions short of dismissal"].)

---

[22] Apart from Benson's misconduct, including his untruthful testimony at the hearing, the trial court did not conclude that there was any intentional misconduct of other members of the district attorney's office or of employees of the Center at Valley Medical. It did make an oral finding that Brown's supervision of the sexual assault unit was negligent in that she failed to (1) follow up on information about the videotaping of SART exams provided to her by Colin in February 2005, and (2) "erect an ethical wall between Mr. Benson and the newly-assigned trial attorney" after defendant's judgment was reversed. These findings were not included in the written order dismissing the information and, in any event, such a finding of negligent supervision is facially not egregious prosecutorial misconduct that would support the sanction of dismissal.

We therefore conclude that Ninth Circuit authority does not support the court's dismissal of the information here for outrageous governmental conduct under the "supervisory powers" prong enunciated by that court.

### 2. *California courts' supervisory powers*

■ California courts are empowered by statute to dismiss criminal proceedings, charges, or allegations in certain instances. For example, under section 1385, subdivision (a), the court has discretion, either on the request of the prosecutor or on its own motion, to order the dismissal of an action "in furtherance of justice." A dismissal under that statute may be appropriate before, during, or after trial. (*People v. Orin* (1975) 13 Cal.3d 937, 946 [120 Cal.Rptr. 65, 533 P.2d 193] (*Orin*); see also *People v. Hatch* (2000) 22 Cal.4th 260, 268–269 [92 Cal.Rptr.2d 80, 991 P.2d 165] [court empowered to dismiss information for legal insufficiency of evidence].) The "in furtherance of justice" language of the statute " ' "requires consideration both of the constitutional rights of the defendant, and [of] *the interests of society represented by the People*, in determining whether there should be a dismissal. [Citations.]" [Citations.]' " (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 530 [53 Cal.Rptr.2d 789, 917 P.2d 628] (*Romero*), quoting *Orin*, at p. 945.) As to the latter aspect of the balancing, the high court has explained: " 'Courts have recognized that society, represented by the People, has a legitimate interest in "the fair prosecution of crimes properly alleged." [Citation.] " '[A] dismissal which arbitrarily cuts those rights without a showing of detriment to the defendant is an abuse of discretion.' [Citations.]" ' [Citation.]" (*Romero*, at p. 531, quoting *Orin*, at p. 947.) Likewise, under section 939.71, subdivision (a), the court may dismiss an indictment where the prosecutor has failed to inform the grand jury of exculpatory evidence and that omission " 'results in substantial prejudice.' " (*Berardi v. Superior Court* (2007) 149 Cal.App.4th 476, 491 [57 Cal.Rptr.3d 170] [showing of prejudice to defendant required for dismissal].)

■ Apart from any statutory authority, California courts have inherent supervisory or administrative powers which are derived from the state Constitution. (*Litmon v. Superior Court* (2004) 123 Cal.App.4th 1156, 1174 [21 Cal.Rptr.3d 21]; Cal. Const., arts. III, § 3, VI, § 1.) The court's broad administrative powers include " ' "the right to control its order of business and to so conduct the same that *the rights of all suitors before them may be safeguarded*. . . ." ' " (*People v. Castello* (1998) 65 Cal.App.4th 1242, 1248 [77 Cal.Rptr.2d 314].) The court's inherent power " ' "arises from necessity where, in the absence of any previously established procedural rule, rights would be lost or the court would be unable to function." [Citation.]' [Citation.]" (*In re Amber S.* (1993) 15 Cal.App.4th 1260, 1264 [19 Cal.Rptr.2d 404].) Those inherent powers, although broad, are not unlimited and may not

be employed in a way that contravenes a statute. (See *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2008) 162 Cal.App.4th 1408, 1420 [77 Cal.Rptr.3d 52] [court did not have inherent power to dismiss dependency petition sua sponte and without prior notice at detention hearing].)

Defendant cites no authority other than *Slesinger, supra*, 155 Cal.App.4th 736, in support of his view that dismissal of the information here was an appropriate exercise of the court's inherent supervisory powers. In *Slesinger*, an investigator hired by the plaintiff committed numerous illegal acts in gathering confidential documents from the defendant to assist the plaintiff in its litigation, including breaking into the defendant's offices and secure trash facilities and by trespassing onto the facility of a company the defendant hired to destroy its confidential documents. (*Id.* at p. 740.) The trial court, concluding that no lesser sanction was available to adequately protect the defendant from the plaintiff's unfair use of the ill-gotten materials, granted the defendant's motion to dismiss as a terminating sanction. (*Ibid.*) The appellate court affirmed, concluding, inter alia, that a California court may, "when faced with pervasive litigation abuse, use its inherent judicial power to *dismiss the action.*" (*Id.* at p. 758, original italics.) *Slesinger* is obviously distinguishable, since it concerned the dismissal of a civil lawsuit due to extreme litigation misconduct. It cannot be relied on to support the proposition that a court may, in the exercise of its supervisory powers, dismiss an information as a sanction for nonprejudicial prosecutorial misconduct involving false testimony.

Moreover, even were we to find the civil litigation principles of *Slesinger* equally applicable to criminal proceedings—a finding we decline to make here—dismissal was nonetheless unwarranted. As the *Slesinger* court explained, "California courts have [the] inherent power to terminate litigation for deliberate and egregious misconduct when no other remedy can restore fairness . . . ." (*Slesinger, supra*, 155 Cal.App.4th at p. 761.) The court explained further that dismissal of a civil lawsuit through the exercise of a court's supervisory powers "is *always* a drastic remedy to be employed *only* in the rarest of circumstances," after considering such factors as "the nature of the misconduct (which must be deliberate and egregious, but may or may not violate a prior court order), the strong preference for adjudicating claims on the merits, the integrity of the court as an institution of justice, the effect of the misconduct on a fair resolution of the case, and the availability of other sanctions to cure the harm. [Citations.]" (*Id.* at p. 764, fn. omitted.) Here, as discussed above, the prosecutorial misconduct did not have an "effect . . . on a fair resolution of the case" (*ibid.*), there were other, less extreme, sanctions available to address the harm, and the dismissal order precluded the People from pursuing the prosecution to its conclusion on the merits.

We conclude that dismissal with prejudice of the information under the circumstances presented here was not authorized as a proper exercise of the court's inherent supervisory powers over the criminal proceedings.[23]

### G. *Conclusion*

The court's finding that Benson engaged in misconduct was supported by substantial evidence. The court, however, in fashioning a remedy did not consider the impact, if any, that the misconduct had on defendant's right to a fair trial. Benson's actions, including falsely testifying at the hearing, did not violate defendant's substantive due process rights under *Rochin, supra,* 342 U.S. 165. No California or federal authorities support the court's dismissal remedy to address prosecutorial misconduct of this nature. Further, dismissal as an exercise of the court's inherent supervisory powers was inappropriate under both the Ninth Circuit authority relied on by the court and under California authority cited by defendant. Moreover, because the proper due process inquiry is the fairness of the trial rather than the prosecutor's culpability (*Smith v. Phillips, supra,* 455 U.S. at p. 219), the court could not disregard the impact of the misconduct on defendant. Since there was no showing (or finding supported by substantial evidence) that Benson's misconduct prevented defendant from receiving a fair trial, the trial court erred in dismissing the information. Our finding of error exists regardless of whether we review the court's determination independently as a mixed question case or, alternatively, conclude that the court abused its discretion by applying an improper legal standard in ordering dismissal of the information.

Our conclusion should in no way be construed as a signal that we condone the misconduct that the trial court found, based upon substantial evidence, to have occurred here. Attorneys may not "mislead the judge or any judicial officer by an artifice or false statement of fact or law." (Bus. & Prof. Code, § 6068, subd. (d).) "[A]n attorney ' ". . . owes the duty of good faith and honorable dealing to the judicial tribunals before whom he practices his profession. He is an officer of the court—a minister in the temple of justice. His high vocation is to correctly inform the court upon the law and the facts of the case, and to aid it in doing justice and arriving at correct conclusions. He violates his oath of office when he resorts to deception or permits his clients to do so." ['] [Citation.] [¶] . . . [¶] Courts expect even higher ethical standards from prosecutors. [Citations.] This is '. . . because of the unique function he or she performs in representing the interests, and in exercising the

---

[23] Our conclusion that dismissal of the information was unwarranted here does not mean that under no circumstances may a court—under the authority of its inherent supervisory powers or otherwise—impose the extreme sanction of dismissing criminal proceedings to address egregious prosecutorial misconduct that is prejudicial to the defendant's right to a fair trial.

sovereign power, of the State. [Citation.]' [Citation.]" (*Morrow, supra*, 30 Cal.App.4th at pp. 1261–1262.) Benson's breach of these ethical obligations notwithstanding, dismissal of the information here acted as a punishment to society for his misdeeds, without consideration of whether those misdeeds prejudiced defendant's fair trial rights. "Dismissal of charges is an extraordinary remedy, which is reserved for the few cases where conduct by the prosecution has completely eliminated the possibility of a fair retrial. [Citation.]" (*People v. Kasim* (1997) 56 Cal.App.4th 1360, 1387 [66 Cal.Rptr.2d 494].)

## DISPOSITION

The order of dismissal is reversed and the matter is remanded to the trial court for further proceedings.

Rushing, P. J., and Grover, J.,* concurred.

A petition for a rehearing was denied October 19, 2011, and respondent's petition for review by the Supreme Court was denied January 25, 2012, S197859.

---

*Judge of the Monterey Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.