Filed 2/10/26  P. v. Meals CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAHEEM MALIK MEALS,<br><br>    Defendant and Appellant. | D084052<br><br><br>(Super. Ct. No. SCD287023) |

APPEAL from a judgment of the Superior Court of San Diego County, Eugenia Eyherabide, Judge.  Reversed and remanded.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Stephanie H. Chow, Junichi P. Semitsu, and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

# I

# INTRODUCTION

Raheem Malik Meals appeals a judgment of conviction after a jury found him guilty of the first degree murder of Ismael Abouabid (Pen. Code, § 187, subd. (a); count 1),[1] second degree robbery (§ 211; count 2), carrying a concealed firearm (§ 25400, subd. (a)(2); count 3), and attempted second degree robbery (§§ 211, 664; count 4). The jury returned a true finding on a robbery-murder special circumstance allegation related to count 1. (§ 190.2, subd. (a)(17)(A).) For counts 1 and 2, the jury found Meals personally and intentionally discharged a firearm causing great bodily injury or death. (§ 12022.53, subd. (d).) The jury also found the concealed firearm giving rise to count 3 was loaded, in Meals's immediate possession, and readily accessible, and Meals was not listed as the firearm's registered owner. (§ 25400, subd. (c)(6).) The trial court found true four aggravating circumstance allegations and sentenced Meals to state prison for an aggregate term of 23 years 8 months, plus life without the possibility of parole (LWOP), calculated as follows: LWOP for the murder conviction, plus 20 years for the related firearm enhancement, plus eight months for the concealed firearm conviction, plus three years for the attempted robbery conviction.[2] The court declined to impose punishment for the robbery conviction and cited section 654 as the purported basis for its ruling.

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    The trial court imposed a prison term of 20 years for the count 1 firearm enhancement under section 12022.53, subdivision (c), instead of a term of 25 years to life under section 12022.53, subdivision (d), as authorized by *People v. Tirado* (2022) 12 Cal.5th 688, 700.

2

On appeal, Meals asks that we reverse his murder and robbery convictions because, he contends, the government violated his substantive due process rights by engaging in outrageous conduct during an undercover jailhouse operation conducted pursuant to *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*). He concedes the *Perkins* operation did not involve coercion or outrageous conduct by the government that interfered with his Sixth Amendment right to counsel. Rather, he asserts the government engaged in outrageous conduct because an undercover civilian agent acting on behalf of law enforcement exploited his relative youth (he was one month shy of 19 years old) and relied on racial bias to build rapport with him and procure his admissions during the *Perkins* operation. Insofar as Meals's trial counsel failed to preserve his substantive due process claim, Meals asserts his counsel was ineffective. Further, both Meals and the People argue that the trial court committed sentencing errors.

We reject Meals's substantive due process and ineffective assistance of counsel arguments. However, we conclude the trial court imposed an unauthorized sentence when it failed to impose a sentence for count 2. Therefore, we reverse the judgment and remand the matter solely for the trial court to resentence Meals. During the resentencing proceeding, the trial court shall impose sentence on all counts, including count 2, and stay execution of sentence as needed to comply with section 654.

## II

## BACKGROUND

Meals is a black male who was one month shy of 19 years old at the time of the events giving rise to his convictions. He is a member of 5-9 Brims (Brims), a criminal street gang and subset of the Bloods. Meals's gang moniker is Little Fader Ant.

3

A. *The Attempted Robbery of M.P. (Count 4)*

On December 28, 2019, two black males wearing hoodies approached M.P. while he was seated in his car. One of the men was armed with a firearm. The men demanded that M.P. exit his car and empty his pockets, and M.P. complied. The armed man then fired multiple shots, striking M.P. in the chest and arm, and both assailants ran away. M.P. drove to the home of his girlfriend, who called the police. M.P. was treated for his non-fatal injuries at the hospital.[3]

After the botched robbery, Meals communicated with a fellow Brims member through text and social media messages. In those conversations, Meals made incriminating statements linking himself to M.P. and the crime.

B. *The Robbery and Murder of Ismael Abouabid (Counts 1 and 2)*

In the early morning hours of January 15, 2020, Meals messaged a member of the Lincoln Park gang, an ally of Brims, about an argument Meals was having with his girlfriend. Meals told his associate he had "too much anger" and would probably "hit" (commit a robbery) the next day.

Later that morning, Meals messaged a marijuana delivery service to deliver him a pound of marijuana shake (broken-down bits or dregs of marijuana), a half ounce of an exotic strain called GDP, and a half ounce of an exotic strain called animal planet. When arranging the delivery, Meals sent the delivery service a photograph of himself in lieu of his identification card. He provided a delivery address a few blocks away from the location where the murder later occurred.

---

[3]     M.P. presented as an uncooperative prosecution witness at trial. However, he recounted the details of the attempted robbery to police officers on the night of the crime. Body worn camera footage of his discussion with the officers was played for the jury.

At 10:26 a.m., Ismael Abouabid, the marijuana delivery driver and murder victim, messaged Meals that he was on his way with the delivery. Abouabid placed four calls to Meals's cellphone between 11:11 and 11:17 a.m. One of the inbound calls was answered at 11:17 a.m., and the call lasted 29 seconds.

The murder occurred near a pedestrian bridge linking a residential street to Southcrest Community Park in southeast San Diego. Surveillance camera footage obtained from a nearby apartment complex showed Meals pacing by the pedestrian bridge between 11:08 and 11:23 a.m., while two of his cohorts waited on the bridge.[4] At 11:23 a.m., Abouabid drove up to the scene in his car. Meals approached the driver's side of the car and had a brief interaction with Abouabid through the car window. Abouabid then pulled his car to the side of the street and Meals entered the car through the front passenger door. Shortly after, Meals's cohorts walked over to the car. When Abouabid pulled his car to the side of the street, the car moved outside the view of the surveillance camera for about four minutes.

During those four minutes, Abouabid was shot in the head and killed. The surveillance camera footage showed Meals and his cohorts running away from Abouabid's car at 11:29 a.m., immediately after the fatal shooting. Meals was carrying a dark-colored bag. Shortly after Meals and his cohorts fled, bystanders discovered Abouabid bleeding and slumped over in the driver's seat of his car. The police and paramedics arrived and declared him dead at the scene. Abouabid had a bullet entry wound on the right temple and an exit wound on his left scalp. There was stippling around the entrance

---

[4]     The defense conceded Meals was the pacing man depicted in the surveillance footage.

wound indicating the gun was no more than two to three feet away when it was fired.

The police lifted latent fingerprints matching Meals's fingerprints from the front passenger door handle and rear passenger window of Abouabid's car. The police also recovered an expended bullet, two packets of marijuana, and a handwritten receipt from the car. The receipt was for shake, GDP, and animal planet, and it was addressed to Fader. The expended bullet was most likely a 0.38 special or .357 magnum fired by a revolver.

In the hours after the killing, Meals sent incriminating text messages to companions and seemingly implicated himself in the killing on social media. At 11:43 a.m., he texted an apology to his girlfriend, stated he "only did it" because he thought she was mad at him, and said she might not see him for a "fat min[ute]." At 4:06 p.m., he posted on social media a photo of himself pointing a revolver into a mirror. At 5:02 p.m., he posted a video on social media in which he stated, "if one of them [n-words] tell on me ... you better make sure a Bri- another Brim [n-word] do something about out it." In the background of the video, Meals's girlfriend waved a marijuana package with the letters GDP on it. At 5:07 p.m., Meals's girlfriend forwarded Meals a message she had received from a companion, which stated, "it coulda been any of us we gone ride this out ...." Meals replied, "Keep an eye on the news," and "Delete th[a]t." Finally, at 5:38 p.m., Meals texted his girlfriend that his grandmother had warned him not to "Be poppin[g] at people," but he "totally ignored [his] granny."

The police identified Meals as a suspect within a day or two of the murder. A few days later, the police executed a search warrant of Meals's mother's apartment, where he sometimes stayed, and seized a dark backpack containing nine ounces of marijuana shake.

6

That same day, the police detained Meals and interrogated him at the police station. A video recording of the interrogation was played for the jury. During the interrogation, Meals stated he joined Brims when he was younger, but he was no longer involved with the gang. When asked about Abouabid's murder, Meals denied being at the crime scene at the time of the killing. He stated he was instead at the mall with his mother, sitting in the car while she shopped. The officers told Meals his fingerprints were in the victim's car, there were social media messages between Meals and the victim, and the surveillance camera captured footage of him at the crime scene. However, Meals steadfastly denied involvement. After the interrogation, the police released Meals for reasons that are not apparent from the record.

The following month, Meals sent an audio clip through social media to a clique of other Brims members. In the audio clip, Meals stated, "I was only here with two other [n-words] and … how the fuck they know the whole story like they was there with me?"

Six months later, Meals was detained in connection with the robbery and murder of Abouabid. Three days after Meals was taken into custody, but before he was charged, detectives conducted an audio-recorded *Perkins* operation in which they placed Meals in a jail cell with an undercover civilian agent and two undercover detectives. During the *Perkins* operation, Meals admitted to the undercover civilian agent that he fired the shot that killed Abouabid, as we shall discuss below. (See *post* III(A)(1).)

C. *The Concealed Firearm Charge (Count 3)*

On March 17, 2020, police officers detained Meals for jaywalking and willfully resisting, delaying, or obstructing a peace officer. One of the officers conducted a pat down of Meals and recovered a loaded and unregistered nine-millimeter semiautomatic handgun from his waistband.

7

## III

## DISCUSSION

A. *Meals Has Not Established That the Government Engaged in Outrageous Conduct in Violation of his Substantive Due Process Rights*

Meals requests that we reverse his murder and robbery convictions because the government (specifically, law enforcement and its civilian agent) purportedly engaged in outrageous conduct during the *Perkins* operation, which violated his substantive due process rights. As noted, Meals does not contend the *Perkins* operation involved coercion, nor does he contend the government engaged in outrageous conduct that interfered with his Sixth Amendment right to counsel. Instead, Meals argues the outrageous conduct consisted of the government targeting his developmental vulnerability as a young adult and invoking racial bias to create an interpersonal bond with him and procure incriminating admissions from him. As we shall explain, Meals's substantive due process argument is forfeited and his alternative claim of ineffective assistance of counsel is without merit.

1. *Additional Information*

Prior to trial, the prosecution filed a motion in limine to admit an audio recording from the *Perkins* operation. Meanwhile, the defense moved to suppress evidence related to the *Perkins* operation on the ground that Meals's Sixth Amendment rights were violated when the undercover agent questioned him without providing an admonition pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. The trial court granted the prosecution's motion in limine and denied the defense's motion to suppress.

At trial, the prosecution elicited testimony from a detective about *Perkins* operations generally and the specific *Perkins* operation involving Meals. The detective testified that a *Perkins* operation is an investigative technique in which a law enforcement agency places one or more undercover

8

civilian agents or law enforcement personnel in a jail setting with a suspect to engage in recorded, non-coercive conversations with the suspect about a crime that has been committed. Here, an undercover civilian agent was placed in the jail cell with Meals.[5] The civilian agent was a black male and former gang member who was in his 40s.

After eliciting this testimony from the detective, the prosecution played an audio recording of the *Perkins* operation for the jury. At the beginning of the operation, the undercover civilian agent asked Meals about the charges he faced. Meals replied that he faced a homicide charge. Meals also disclosed that he had just completed a suspect lineup. When describing the suspect lineup, Meals said, "Shit ain't none of them [n-words] look like me." Thereafter, Meals and the agent casually used the n-word dozens of times during the conversation.

After Meals disclosed that he faced a homicide charge, the civilian agent purported to give advice to Meals about how best to navigate his upcoming prosecution. He implored Meals to learn about the evidence against him, and "sit back and listen" to law enforcement. The agent stated, "[w]hen these white folks book you for murder, man, you gotta take that shit serious." He also said, "sometimes when these crackers get you good man ... you be a damn fool to go [to] trial cause if you go to trial and they get you, you gonna get life." Over the course of the *Perkins* operation, the agent referred to law enforcement officers as "crackers" seven times. While purporting to give advice to Meals, the agent stated he was 50 years old and from Compton. He also told Meals he had accepted a plea agreement and served time in prison for a murder charge he faced when he was in his twenties.

---

[5]     Two undercover detectives were also placed in the cell with Meals, but they were removed shortly after the operation began.

At one point during the *Perkins* operation, a detective approached the jail cell and presented Meals with certain incriminating evidence against him, including a social media photograph of Meals holding a gun and the marijuana receipt from the victim's car. In response, Meals became agitated, interrupted the detective, and said he was "done talking." After the detective left, the undercover agent purported to give further guidance to Meals, telling him to keep calm and learn about the evidence against him. While ostensibly providing this advice, the agent stated, "you a young black dude, homie, you know what I'm saying, and I'd rather see you on the street." Soon after, Meals responded, "I understood the moment you came in here, me and you. ... I was glad you started talking to me I swear to God, yeah." The agent replied, "I been young like you homie, I been in your shoes before and I know how this shit go man."

After this exchange, Meals made several incriminating admissions to the agent. The agent asked Meals if he left fingerprints behind and Meals said, "I think we both did." The agent asked, "you didn't get a chance to clean nothing up or nothing?" Meals responded, "Uh, well - at the scene, right after the [n-word] (unintelligible) I didn't clean nothing I grabbed up the whoopty, pissed on my hands." Then, the agent asked, "you didn't look around ... to see if there's any cameras or anything around?" Meals replied, "Oh no, I knew – we was – we was in – in our section and, and we – we broke all them." The agent asked Meals to clarify whether he "broke all the cameras," and Meals said, "We done broke all them, yeah." Thereafter, the agent asked, "It was you and three other people?" Meals responded, "Nah, just, uh, me and two ... other homeboys." When asked whether he had committed a "weed lick" (a weed robbery), Meals replied, "Er, yeah, something like that."

10

Meals also disclosed to the undercover agent a tactic he hoped to use to potentially defend against the impending homicide charge. He told the agent, "I was going to[] pull some self-defense shit, if they asked me .... I can say that was that [n-word's] gun. And he pulled it out on me, you know, we tussled, you know how that shit happen. That's what I was thinking."

After raising the possibility of self-defense, Meals made several more damning admissions. When asked if he took the victim's car, Meals stated he "ran to … the nearby pad." Then, Meals stated, "I was just [sup]posed to take his shit ... he tried to grab my shit ....  My instinct, any [n-word] try to grab my shit .... I just wanted him to know, [n-word] let go ...."  The agent asked Meals if the victim tried to take his pistol from him and Meals stated, "Yeah, [n-word], man, like I said, we was wrestling on it ... but once I cocked that [n-word], once I got it out of his hand, pull it back on, yeah, [n-word] you know?"  The agent asked how many times Meals "popped" the victim and Meals said, "Just one."

After Meals made these admissions, the detectives running the *Perkins* operation arranged for a fake FBI agent to take the undercover civilian agent away for a debriefing. The agent was returned to the jail cell and Meals again brought up his plan to argue self-defense, but then stated his grandmother had cautioned him against it and wanted him to stick to his "first story." A deputy removed the undercover agent from the jail cell soon afterwards.

2. *Legal Principles*

The government obtained the admissions at issue during a *Perkins* operation, named after the United States Supreme Court's seminal *Perkins* decision. In *Perkins*, "the Supreme Court held that an 'undercover law enforcement officer posing as a fellow inmate need not give *Miranda*

11

warnings to an incarcerated suspect before asking questions that may elicit an incriminating response.' *Perkins* came to this conclusion because '[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. [Citations.] When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking.' " (*People v. Felix* (2024) 100 Cal.App.5th 439, 450.)

Meals challenges his murder and robbery convictions on the basis that the government engaged in outrageous conduct during the *Perkins* operation, violating his substantive due process rights under *Rochin v. California* (1952) 342 U.S. 165. In that case, deputy sheriffs illegally entered the defendant's residence without a warrant, witnessed the defendant swallow two morphine capsules, and jumped on the defendant to try to forcibly remove the capsules. (*Id.* at p. 166.) When that tactic proved unsuccessful, the deputies took the defendant to the hospital and had his stomach involuntarily pumped to induce vomiting. (*Ibid.*) The morphine capsules were admitted as the "chief evidence" against the defendant at trial. (*Ibid.*) On appeal from the defendant's judgment of conviction for possession of morphine, the Supreme Court held that the government's conduct was so "brutal" and "offensive" that it violated the defendant's due process rights and required reversal of the judgment. (*Id.* at pp. 172, 174.) The court explained, "[T]he proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience." (*Id.* at p. 172; see

also *United States v. Salerno* (1987) 481 U.S. 739, 746 ["So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' [citation], or interferes with rights 'implicit in the concept of ordered liberty' "]; *Breithaupt v. Abram* (1957) 352 U.S. 432, 435 [government conduct is "offensive to due process" when it " 'shock[s] the conscience' and [is] so 'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency"].)

"The determination of whether the government engaged in outrageous conduct in violation of defendant's due process rights is a mixed question. The first step involves the consideration and weighing of the evidence and assessing the credibility of the witnesses to determine factually whether, and to what extent, governmental misconduct occurred. This factual determination is clearly one that is subject to a deferential standard of review. But the second step—whether the governmental conduct constitutes outrageous conduct in the constitutional sense of violating defendant's due process rights—involves the application of law to the established facts and is primarily a legal question." (*People v. Uribe* (2011) 199 Cal.App.4th 836, 857–858 (*Uribe*).) Thus, the question of whether "the governmental conduct was outrageous in violation of defendant's due process rights ... is subject to independent review." (*Id.* at p. 858; see also *People v. Aguilera* (2020) 50 Cal.App.5th 894, 908–909; but see *People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 445–446 [applying abuse of discretion standard when reviewing dismissal of criminal charges based on government misconduct].)

3. *Analysis*

Meals contends his murder and robbery convictions must be reversed because the prosecution relied on evidence obtained by law enforcement through outrageous conduct during the *Perkins* operation. The People claim

13

Meals's due process argument is forfeited because he did not present the argument to the trial court.  We agree with the People.

" ' "[N]o procedural principle is more familiar to [the] Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.)  " 'The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected.' " (*Id.* at p. 881; see also *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 ["If a defendant fails to make a timely objection on the precise ground asserted on appeal, the error is not cognizable on appeal."].)

Meals's trial counsel objected to the admission of his statements during the *Perkins* operation, but only on the ground that he was allegedly subjected to a custodial interrogation in violation of the Sixth Amendment under *Massiah v. United States* (1964) 377 U.S. 201.  He does not renew this claim on appeal.  To the contrary, he concedes the government did not engage in outrageous conduct that interfered with his Sixth Amendment right to counsel.  As for Meals's claim on appeal that the government engaged in outrageous conduct in violation of his substantive due process rights, Meals's trial counsel did not object to the admission of the statements on this specific basis.  Because Meals did not raise his substantive due process argument below, he has forfeited his claim of error on appeal.  (See *People v. Low* (2010) 49 Cal.4th 372, 393, fn. 11 [due process challenge based on claim of outrageous government conduct forfeited where not raised at trial]; *People v. Maury* (2003) 30 Cal.4th 342, 418, fn. 17 [same].)

Alternatively, Meals asserts his trial counsel was ineffective because she failed to object to the admission of the *Perkins* operation evidence on

14

substantive due process grounds. We are not persuaded. To prevail on an ineffective assistance of counsel claim, a defendant must "demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result." (*People v. Dennis* (1998) 17 Cal.4th 468, 540–541; see *Strickland v. Washington* (1984) 466 U.S. 668, 687.) Here, Meals cannot establish that his trial counsel rendered deficient performance because his counsel reasonably could have concluded that a substantive due process objection would have been meritless. (*People v. Price* (1991) 1 Cal.4th 324, 387 (*Price*) ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile."]; see *In re A.A.* (2018) 30 Cal.App.5th 596, 600 ["Defense counsel does not render ineffective assistance by declining to raise meritless objections."].)

The California Supreme Court and the United States Supreme Court "have employed a two-step methodology" to resolve substantive due process claims like the one Meals asserts here. (*People v. Cannon* (2025) 18 Cal.5th 497, 522.) " 'First, the court must make a " 'careful description' of the asserted fundamental liberty interest." [Citation.] This "careful description" is concrete and particularized, rather than abstract and general ....' [Citation.] 'Second, the court must determine whether the asserted interest, as carefully described, is one of our fundamental rights and liberties; central to this determination is whether the asserted interest finds support in our history, our traditions, and the conscience of our people.' " (*Ibid.*) Important here, courts have " 'always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in

15

this uncharted area are scarce and open-ended.  [Citation.]  The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' "  (*Uribe, supra*, 199 Cal.App.4th at p. 863, quoting *Collins v. Harker Heights* (1992) 503 U.S. 115, 125.)

Meals has failed to provide our court with a careful description of the asserted fundamental liberty interest he contends was implicated by the conduct of the undercover agent during the *Perkins* operation.  Meals contends the liberty interest implicated by the government's conduct was "his *liberty*, a fundamental liberty interest under the United States and California Constitutions."  There are three problems, all fatal, with this contention. *First*, it is made for the first time on appeal and belatedly in his reply brief. (See *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10 ["Obvious reasons of fairness militate against our considering this poorly developed and untimely argument" made for the first time in a reply brief].)  *Second*, this broad and circular description is neither concrete nor particularized.  (See *Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 141 [rejecting plaintiff's description of his "so-called unconstitutional deprivation of liberty as 'incarceration absent a criminal conviction' … an issue-begging generalization that [was] far too broadly stated"].)  And *third*, " 'under the more-specific-provision rule of *Graham v. Connor* [(1989) 490 U.S. 386,] 395, [a] defendant may not assert a substantive due process claim if there is a particular amendment providing 'constitutional protection' against a particular sort of government behavior.' "  (*Uribe, supra*, 199 Cal.App.4th at p. 864.)  Thus, Meals is precluded from asserting a substantive due process claim on the basis of a fundamental liberty interest derived from constitutional sources, even if he had identified them with specificity.

16

For all these reasons, we conclude that Meals's trial counsel reasonably refrained from interposing a meritless substantive due process objection in the trial court. (See *Uribe, supra*, 199 Cal.App.4th at p. 863 [rejecting substantive due process claim based on outrageous governmental conduct where defendant did not identify a fundamental liberty interested implicated by government's misconduct].) On this basis alone, we conclude Meals has failed to establish ineffective assistance of counsel.

B. *The Trial Court Committed Sentencing Error*

The trial court did not impose a sentence for count 2, the second degree robbery conviction. Instead, during sentencing, the court stated, "as it relates to Count 2 ... that's barred 654." From this comment, it is apparent the court intended to stay punishment for count 2 under section 654.

Section 654 states, in relevant part, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Stated differently, section 654 " 'prohibits multiple punishment for the same "act or omission." ' " (*People v. Correa* (2012) 54 Cal.4th 331, 337.) When section 654 is applicable, "the accepted 'procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable.' " (*People v. Jones* (2012) 54 Cal.4th 350, 353; see also *People v. Duff* (2010) 50 Cal.4th 787, 796 ["when a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence"].)

In their appellate brief, the People contend Meals's sentence is unauthorized because the court failed to adhere to the accepted sentencing procedure of imposing sentence on all counts, including count 2, and staying

17

execution of sentence for certain counts as needed to comply with section 654. We agree.[6] (See *People v. Mani* (2022) 74 Cal.App.5th 343, 380 (*Mani*) [when section 654 applies, "it is improper to impose no sentence or to stay *imposition* of the sentence"]; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1473 [when section 654 applies, "the trial court impose[s] an unauthorized sentence by failing to sentence defendant" on all counts].)

Because the sentence is unlawful, we remand the matter to the trial court for resentencing purposes. (*Mani, supra*, 74 Cal.App.5th at p. 381.) "[O]n remand ' "a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances." ' " (*In re Mattison* (2025) 115 Cal.App.5th 1062, 1067.) However, the court shall impose sentence on count 2 and stay execution of any sentence as needed to comply with section 654.[7]

---

[6] The abstract of judgment incorrectly states that the trial court imposed the upper term for count 2 and stayed the sentence under section 654. However, the court did not impose sentence for count 2 during the sentencing hearing. "Where, as here, a discrepancy exists between the court's 'oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls.' " (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 893.) " 'The clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment.' " (*People v. El* (2021) 65 Cal.App.5th 963, 967.)

[7] Because we are remanding the matter for a full resentencing proceeding, we do not address Meals's claim that the trial court erred when it sentenced him for count 4. (See *Conte v. Wyeth, Inc.* (2008) 168 Cal.App.4th 89, 114 ["As a general rule, we will not resolve an issue that is unnecessary to disposition of an appeal"].) On remand, Meals may present the trial court with his arguments concerning the proper sentence for count 4.

IV

DISPOSITION

The judgment is reversed, and the matter is remanded for resentencing purposes only.  During resentencing, the trial court shall impose sentence on all counts, including count 2, and stay execution of sentence as needed to comply with Penal Code section 654.  The trial court shall also prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


McCONNELL, P. J.

WE CONCUR:


IRION, J.


DO, J.


19